Margaret Pegg, Appellant, v. Julius Pegg, Administratrix of the Estate of Elias W. Pegg, Deceased, et al.

**Common-law marriage.** A common-law marriage consisting of a
1    present agreement to be husband and wife followed by cohabitation is valid; but such an agreement, written or oral, with no intention of assuming the relation does not constitute a marriage, especially where there is some other purpose for making the agreement.

**Same:** EVIDENCE. An agreement to marry followed by cohabitation will presumptively establish a common-law marriage; and

common repute, if uniform, as well as the public conduct of the parties may be considered on the issue of a common-law marriage. In the instant case the evidence is held to show that plaintiff's relation with decedent was that of housekeeper rather than his wife.

*Appeal from Harrison District Court.*— HON. O. D. WHEELER, Judge.

SATURDAY, APRIL 11, 1908.

REHEARING DENIED, MONDAY, JUNE 8, 1908.

ACTION in equity by Margaret Pegg, claiming to be the widow of Elias W. Pegg, deceased, to have her right to one-half the property of the decedent confirmed in her as his widow, to have said property partitioned, and to have defendants enjoined from interfering with plaintiff in the enjoyment of the property alleged by her to have been occupied by her and decedent at his death as a homestead, and asking other equitable relief. Defendants, who are the heirs at law of decedent, one of them having been appointed administrator of his estate, denied the allegations of the petition, and specifically denied that plaintiff is the widow of decedent. After trial on the merits the court dismissed plaintiff's petition, and she appeals.— *Affirmed.*

*Cochran & Egan,* for appellant.

*Roadifer & Arthur* and *C. A. Bolton,* for appellees.

McCLAIN, J.— In 1882 Elias W. Pegg, an unmarried man, who had at one time been a school teacher, and who was then a farmer living in Harrison county, employed in his home as housekeeper the plaintiff, then and since known as Mrs. Margaret Asher. She brought with her to his house two infant daughters, who lived with him until their

marriage. According to her testimony she had been married to one Asher of Tama county, and had been left by him in 1875, since which time she had not heard from him. The presumption that he was dead in 1882 is not contradicted by any evidence in the record. From 1882 until 1885 decedent and plaintiff occupied the ostensible relation of employer and employé, and it appears that there were written contracts between them of employment specifying the wages per week to be paid plaintiff, and showing by indorsement the payment of various sums. Twice in 1885 these two were arrested and brought before a justice of the peace in the county on the charge of illicit cohabitation, and on one of these occasions a written contract of employment was introduced in evidence for defendants. On the day the second of these prosecutions was dismissed, as the evidence tends to show, an instrument was drawn up by their lawyer and signed by them in his office purporting to be a marriage contract between them, by which they agreed to take each other as lawful husband and wife, and live together as such during life. The original of this contract was not produced on the trial, but it was proved by copy and by the testimony of witnesses who had seen and read it, and who testified to its contents as corresponding with the copy. One of the contentions for appellees is that the existence of this contract is not established, and the court below so found, but we think the evidence established its execution and its existence in the home of decedent for many years and until near the time of his death in 1906; plaintiff being an occupant of his home during the entire time. It may be conceded that the circumstance under which the copy is claimed to have been made by Mrs. Wilke, one of plaintiff's daughters, in 1902, and the lack of care with reference to its preservation, in view of the purpose for which she testified she made it — to preserve some evidence of her mother's marriage to decedent — were peculiar, but we are so well satisfied that there was

such a contract, and that its contents were substantially those of the copy introduced in evidence, that we do not feel justified in giving this phase of the case any further attention.

Counsel for appellees further contend, however, that this contract, so called, was entered into merely as a blind to be used to prevent or defeat further prosecutions for illicit cohabitation, that the relations of the parties had been and continued to be meretricious and illicit, and that they never assumed toward each other the relations of lawful marriage. It must be conceded that the voluntary signing of a written instrument of agreement to regard each other as husband and wife does not alone create the relation of marriage between a man and a woman. Although marriage is defined in our Code as a civil contract (section 3139), nevertheless the methods in which marriages must be solemnized are expressly prescribed (section 3145), and the signing of a contract is not one of them. We recognize so-called common-law marriages as valid; but for such a marriage to be valid there must be a present agreement to be husband and wife, followed by cohabitation as such. *Blanchard v. Lambert,* 43 Iowa, 228; *McFarland v. McFarland,* 51 Iowa, 565; *Brisbin v. Huntington,* 128 Iowa, 166. That a mere written or oral agreement to be husband and wife, without present intention to assume that relation in fact, does not constitute a marriage between the parties, especially if the agreement is entered into for some other purpose, is well settled. Schouler, Domestic Relations, section 26; 1 Bishop, Marriage and Divorce, sections 328–335; Rodgers, Domestic Relations, section 96; *Clancy v. Clancy,* 66 Mich. 202 (33 N. W. 889).

1. COMMON LAW MARRIAGE.

The question for us to decide, therefore, under the evidence, is whether these two persons cohabited as husband and wife — that is, intending to occupy that relation to each other—or whether their relations continued to be or became illicit after the agree-

2. SAME: evidence.

ment was signed; for that they did cohabit admits of no question. No doubt proof of the agreement followed by cohabitation would presumptively establish a common-law marriage, and we must consider the various circumstances relied upon to show a contrary intent. Public repute may be considered in such cases, but here there is no controlling evidence of this kind one way or the other. Before the contract, there had been much neighborhood comment of an unfavorable character as to the relations of these parties, and to some extent this continued, and some who did not regard the relations of the parties as illicit considered plaintiff to be decedent's housekeeper merely, and not his wife. Common repute to be significant should be uniform. Rodgers, Domestic Relations, section 94. The public conduct of the parties toward each other is entitled to weight; but here we find little to help us. Before the marriage contract, plaintiff had not only performed the usual services of a housekeeper for decedent, but had helped him care for the stock on the farm, and had worked for him in the fields. She continued in these employments without apparent change in their relations until the farm was sold a few years before decedent's death. There is no evidence of regular payment of wages, but plaintiff acquired title to a forty-acre tract of land in the neighborhood, not entirely, as it is evident, from a small inheritance from her mother, and subsequently she conveyed this land to another, and received from decedent a deed for a considerable tract of land in Canada. Plaintiff had money which she loaned, and decedent transferred to her by indorsement notes (one of them as appears for more than $1,000) which he had taken for money loaned by him, which notes she retained and collected. These transactions are not only significant as indicating that decedent was treating her as accumulating an independent estate, but also by reason of the form in which they were carried out. When the forty-acre tract was purchased by her, she was named Margaret Asher in the conveyance, and subsequently

she conveyed this same tract by deed as "Margaret Asher, unmarried," and in that name received a conveyance of the Canada land from decedent. The conveyance of this forty acres was executed in the presence of decedent and at the same time he conveyed another tract to the same grantee, describing himself in the deed as unmarried. In no instance, so far as plaintiff herself or her witnesses could specify, did plaintiff sign her name as Margaret Pegg, always as Margaret Asher, and in the latter name after decedent's death she receipted to his administrator for money paid to her in reimbursement of some expenditures made by her for decedent. She was content to be known as Mrs. Asher, and never save as testified to by two or three witnesses, in private conversations with her women friends, did she lay claim to the right to be called Mrs. Pegg. She was sometimes spoken of or addressed as Mrs. Pegg, but only on the few occasions just referred to did she indicate that she should be so addressed.

After the brothers of decedent, without opposition, had taken possession of his household furniture and personal effects, plaintiff went to her husband's banker, and, telling him that decedent had directed her to come to him if she found herself in any trouble, she advised with him about presenting a claim against the estate for services as housekeeper. He figured up the amount at a specified sum per week for twenty-two years; but he then suggested to her that in all probability she could claim an interest in the estate as common-law wife, to which she replied that she did not want to do that. Not until after this suggestion was made did she assert any property rights as decedent's widow. Soon after decedent's death, letters were sent to his relatives announcing the fact and the incidents of his funeral, signed "Margaret Asher," and in answer to letters received by plaintiff from his relatives addressed to "Mrs. Margaret Asher" answers were sent with the same signature. In these letters the writer, purporting to speak as Mrs. Asher, referred to the

warm friendship she had formed for deceased during their companionship, and spoke of him as a dear and trusted friend. There are no expressions in these letters which could not have been expected from one who considered herself merely a housekeeper. As to one of these letters, the testimony of a woman who was living in the house at the time of decedent's death was that she wrote it at the direction of plaintiff, but without suggestions as to contents. A granddaughter fourteen years of age testifies to having written the two which were in response to letters received, and she testifies, further, that she assisted the woman above referred to in composing the fourth. These two witnesses disclaim any dictation from plaintiff as to the language used; but it remains conceded that these letters were written under plaintiff's general direction, and that they were such letters as she desired to have written.

Plaintiff testified at length as a witness in her own behalf, and gave details as to the execution of the marriage contract, but on the important questions as to whether she was regarded as decedent's wife and insisted as being so treated, and as to whether decedent held her out to the world as his wife, she adds nothing to the indefinite and inconclusive testimony of the other witnesses. Decedent is shown to have been an uncommunicative man, and, aside from the few occasions on which he privately showed the marriage contract to particular individuals, he is not shown to have held plaintiff out, or treated her, or asked to have her treated, as other than his housekeeper. We have stated as fully as practicable the evidence in the record. While it is in some respects conflicting, and in some respects tends to show a willingness on the part of plaintiff and decedent that they be considered husband and wife, it indicates affirmatively, as we think, that they did not consider themselves to be in fact and in intent husband and wife. As we said in discussing a somewhat similar situation in *Brisbin v. Huntington,* 128

Iowa, 166, the conduct of the parties refutes the claim of marriage.

Especially inexplicable on the theory of marriage is the conduct and testimony of plaintiff. Even when the relation is unsatisfactory, a married woman from instinct, as well as interest, discloses and insists upon the recognition of her status, unless there is some strongly controlling reason for dissimulation. Here no reason is suggested. Plaintiff does not testify that decedent expressed any desire that the true relation be concealed, but without any satisfactory excuse she allowed herself to be known and treated as Mrs. Asher, decedent's housekeeper. She is illiterate, perhaps, but not without experience in the world and knowledge of the customs and sentiments of womankind. The language used in *Terry v. White,* 58 Minn. 268 (59 N. W. 1013), with reference to somewhat similar facts (with proper change of names) will express our views in the case before us: " It sufficiently appears that respondent did not herself regard the relation between her and Terry as that of marriage. After his death she signed the receipt and postal card by her maiden name, and did not consider herself the widow of Terry until she was informed by her lawyer that she could make that claim. This is not consistent with an agreement or understanding that they were married." And the court continues with a quotation from *Cross v. Cross,* 55 Mich. 287 (21 N. W. 313): " We cannot avoid the conclusion that whatever these parties may have done to keep up appearances neither of them ever supposed they were married."

The finding of the trial court that the written contract was not intended as a contract of marriage, and was not subsequently treated by them or either of them as a marriage contract, and that the relation thereafter sustained by plaintiff to decedent was that of housekeeper for him, is, as we think, sustained by the preponderance of the evidence; and the decree dismissing plaintiff's petition is *affirmed.*