### GRIGSBY v. REIB et al.

(Court of Civil Appeals of Texas. Dallas. June 24, 1911. Rehearing Denied Oct. 7, 1911.)

1. MARRIAGE (§ 50*) — COMMON-LAW MARRIAGE—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to recover personalty belonging to a decedent on the ground that plaintiff was his common-law wife, held to sustain a finding that she made no agreement to become decedent's wife, or that any agreement made was not made in good faith with intention to cohabit thereunder.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

2. TRIAL (§ 203*)—INSTRUCTIONS—DUTY TO INSTRUCT.

It is the court's duty to submit an issue raised by the evidence to the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 477–479; Dec. Dig. § 203.*]

3. MARRIAGE (§ 20*) — COMMON-LAW MARRIAGE—ELEMENTS.

A mere agreement to become husband and wife without a present intention to assume that relation does not constitute a marriage; it being essential that the parties in good faith bind themselves to live apart from all others during their joint lives.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 12–14; Dec. Dig. § 20.*]

4. MARRIAGE (§ 11*)—VALIDITY—EXISTENCE OF FORMER MARRIAGE.

An agreement to live together as husband and wife, made during the lifetime of the wife of one of the parties, was void, and could not constitute a marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 30; Dec. Dig. § 11.*]

5. MARRIAGE (§ 20*) — COMMON-LAW MARRIAGE—DEFINITION.

A valid marriage may be entered into by a mutual agreement between two competent parties, whereby they presently contract to become husband and wife and mutually promise to continue that relation during their joint lives, and cohabit, and assume the other duties of husband and wife; but a mere agreement between a man and a woman to be husband and wife without presently assuming that relation is insufficient.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 12–14; Dec. Dig. § 20.*]

6. APPEAL AND ERROR (§ 1066*)—HARMLESS ERROR—INSTRUCTIONS.

Any error in a charge, requiring the contracting parties to have lived together pursuant to their agreement in order to constitute a common-law marriage, was not prejudicial to one claiming the property of a decedent under a marriage by private agreement with him, where her evidence was that they cohabited as husband and wife under their agreement to assume that relation, especially where the jury found against the existence of the marriage.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. § 1066.*]

7. TRIAL (§§ 261, 267*)—INSTRUCTIONS — REQUEST.

The court must give a requested charge without modification, and where the charge requested, consisting of separate subdivisions defining distinct conditions of fact essential to be found, contains a subdivision which is erroneous as applied to the facts, the court may refuse the whole charge, though it may modify it by eliminating the erroneous subdivision.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 660, 668–672; Dec. Dig. §§ 261, 267.*]

8. MARRIAGE (§ 11*)—BY AGREEMENT OF PARTIES—EVIDENCE—COMPETENCY.

Since an agreement to live together as husband and wife, made while one of the contracting parties had a wife living, was void, neither such agreement nor the conduct of the parties pursuant thereto before the death of the wife of such contracting party could be considered in determining whether the contracting parties made a valid contract of marriage after the death of the wife of such contracting party.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 30; Dec. Dig. § 11.*]

9. MARRIAGE (§ 42*)—MARRIAGE BY MUTUAL AGREEMENT — EVIDENCE. — CHARACTER OF AGREEMENT.

The general reputation of a woman for chastity and the reputation, as a house of assignation, of the house in which she and her alleged husband are claimed to have resided,

are admissible in evidence on her claim of a marriage by mutual agreement on which she based a claim to property of the alleged husband.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 70, 78; Dec. Dig. § 42.*]

10. EVIDENCE (§ 474*)—OPINION EVIDENCE—CONCLUSIONS.

The conclusions of a nonexpert witness are not admissible, and a witness who had merely had a talk with another at a certain house was not entitled to testify that such house was the home of such other.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 474.*]

11. WILLS (§ 384*)—PROBATE—APPEAL.

Where plaintiff's application to annul an order probating a will, and her applications to withdraw the estate from administration and for an allowance as widow in lieu of exempt property, were separate proceedings taken at different times, her appeal from orders denying the applications to withdraw the estate from administration and for an allowance did not raise for review the order refusing to annul probate.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 384.*]

12. WILLS (§ 371½*)—PROBATE—VACATION.

Even if appeal from orders denying applications to withdraw an estate from administration and for an allowance to plaintiff as widow, in lieu of exempt property, which applications were made at different times from an application to annul probate, would raise for review an order refusing to annul probate, the order of probate was not vacated by dismissal of the appeal from the orders denying the applications to withdraw from administration and for an allowance.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 371½.*]

Error from District Court, Dallas County; E. B. Muse, Judge.

Action by Jessie Stallcup Grigsby against Eliza J. Reib and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Parks, Patton & Plowman and W. H. Allen, for appellant. W. L. Crawford, Jr., and Wendell Spence, for appellees.

TALBOT, J. This suit was instituted by the plaintiff in error, Jessie Stallcup Grigsby, who will hereafter be called "plaintiff," against Eliza J. Reib, defendant in error, who will hereafter be referred to as "defendant," and her late husband, J. H. Reib, to recover a very large amount of real and personal property which is described in plaintiff's petition. After the institution of the suit, the defendant, Eliza J. Reib, was divorced from her husband, J. H. Reib, and he having no interest in the property, and claiming none, the case was dismissed as to him. The petition alleges, in substance, that the plaintiff is the surviving wife of G. M. D. Grigsby, deceased; that the said Grigsby died in July, 1906; that the property sued for and described in plaintiff's petition was the common property of the said G. M. D. Grigsby and plaintiff; that

the defendant, without right and contrary to law, had taken possession of said property, which consisted principally of money, bank stock, and lands of probable value of $500,000, and had converted and was converting the same to her own use and benefit; that the defendant, although often requested, had failed and refused to deliver any part or portion of said property to the plaintiff, to her damage $500,000. The petition further alleged that the defendant had in her possession all the paper evidences of title to said property and had in her possession, in addition to the property specifically described in the petition, $100,000 in money owned by the said G. M. D. Grigsby, which she, the defendant, was concealing from the plaintiff. The prayer of the petition is that plaintiff recover of and from the defendant the title and possession of all of said property; that for such of said property as may have been converted by defendant and placed beyond the reach of the plaintiff plaintiff have judgment for the value thereof. The defendant answered by general and special demurrers, a general denial, and special pleas, which need not be stated, as a knowledge of them is not necessary to an understanding of the opinion. The controlling issue in the case was whether the plaintiff and the said Grigsby became husband and wife in April, 1905, by mutual agreement. The case was tried before a jury and resulted in the following verdict being returned: "We, the jury, find that plaintiff was not the common-law wife of G. M. D. Grigsby, deceased, and we find for the defendant, Eliza J. Reib. [Signed] R. G. Gaines, Foreman."

[1] The first assignment of error is, in substance, that the verdict of the jury is without any evidence to support it, for that it was shown by the undisputed evidence that the plaintiff on or about the 10th day of April, 1905, made and entered into a valid contract of marriage with the deceased, G. M. D. Grigsby, and that they were thenceforth man and wife until the date of the death of the said Grigsby. In this view of the evidence we do not concur. On the contrary, we think the evidence amply sufficient to authorize and sustain the verdict of the jury. The plaintiff testified that she was first married to one Joseph Graham; that after his death she married W. K. Stallcup, lived with him about one year; that she did not know what became of him; that she was divorced from him in 1900 in East St. Louis; that she came to Dallas in 1901, as a commercial traveler selling Madam Stanley's face goods; that she met G. M. D. Grigsby at the Oriental Hotel; that she had never known Grigsby before meeting him at the Oriental Hotel; that Grigsby represented himself to be a single man; that they had a mutual agreement

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

that they were husband and wife, and went into the rooming house business; that she afterwards discovered that Grigsby was a married man at that time and ceased her relations with him until after the death of his wife; that on or about the 10th day of April, 1905, she and the deceased, Grigsby, "were married by mutual agreement and lived together as husband and wife after that until his death." But from other testimony adduced the jury was clearly warranted in concluding that no such marriage, or contract of marriage, was entered into. The preponderance and weight of the testimony establishes that plaintiff, at and after the date of the marriage, asserted and claimed by her, was a prostitute and the keeper of a notorious assignation house; that in connection with and at her assignation house, which she says was the home of herself and Grigsby, she sold, under a federal license alone, beer and wine; that, during the time she claims to have been the lawful wife of G. M. D. Grigsby under the marriage agreement testified to by her, she retained the name of a former husband, Stallcup; that she habitually had promiscuous sexual intercourse with other men; that she did not know the full name of the said Grigsby; that she transacted business, borrowed money, made sales and conveyances of property in the name of Mrs. Jessie Stallcup, stating at the time that she had been divorced from her husband and had not married again; that she made bank deposits, contracts with the telephone company, and, in fact, transacted all of her business under the name of Jessie Stallcup. It further appears that the said Grigsby, for some time prior to the date of the marriage contract asserted by plaintiff, and practically up to the time of his death, was in very ill health, much of the time under the care of physicians and in sanitariums or traveling in search of health; that very shortly after entering into the contract of marriage claimed by plaintiff G. M. D. Grigsby took a trip to Europe in search of health; that, notwithstanding he was gone several months, no letters passed between him and plaintiff; that, as a result of disease with which he was then suffering, Grigsby died at the house of his mother-in-law at Jefferson, Tex., in June, 1906; that plaintiff did not attend his funeral or communicate with any member of his family with reference to his death; that she did not disclose her claim of marriage to Grigsby until more than a year after his death, the probate of his will, and the granting of administration upon his estate.

On the issue of plaintiff's alleged marriage to Grigsby, and as tending to show her true character, we quote from her own testimony as follows: "I had been married twice before. I knew there was usually a little ceremony that was performed when people became man and wife, but I never

had been successful that way, and we were satisfied and agreed to become husband and wife. I wanted to try it a new way. I was not acquainted with the Texas rules. We moved there (408 Wood street) to commence relations same as that of man and wife. * * * I sold liquor there under a license, kept few cold bottles in my ice box. When I moved to Wood street to open up there, I took out liquor license from the federal authorities. I never did take out a state and county license. I didn't know but that one license was required. I had no regular price for my liquors. When I found out that Mr. Grigsby was a married man, I ceased having relations with him. After that I was trying to make a living for myself off of my house the best way I could. I was a Christian woman. I sold beer and I made some on it. * * * I don't know who I sold beer to. I don't know who was in my house. Some were there that I never saw. In the last year or two a great many would just go there with the girls or to see the girls in the girls' rooms and I would not see them. * * * Those girls, Rosa and Lynnie, the Greek girl I mentioned, would receive company in their own room. Sometimes they would get beer. I don't know that they were there to see those girls for the purpose of assignation. I don't know that I was running an assignation house. * * * I had different prices for my rooms. If a gentleman came alone, I charged him $1 for a room. If he came with his wife or somebody else's wife—I don't know if he did—I charged more; naturally they used more linen. Some of them would lay down a $5 bill to stay there one night. They appreciated my attention. Beer might have been included. I kept a high-class cottage. I did so well in the cottage that I built a 14-room house. I considered that I did a big business. I maintained the same prices for the 14-room house that I did for the cottage. The girls did not divide what the men paid them. When Mr. Grigsby came back and asked me to forgive him, he received me with open arms. I went right to him. He suffered for all the wrongs he done me. He suffered physically, too; his afflictions were very pitiful. The reason I did not tell anybody my claim sooner was that I was ashamed of both of us. * * * When Mr. Grigsby came back in 1904 and asked me to forgive him, we became husband and wife in April, of 1905. We did not have any ceremony then. We did not consider it better to have a ceremony. There was no license issued to my knowledge. We just renewed our love."

By the testimony of Helen Lynn, who was an inmate of plaintiff's house at 408 Wood street, it was shown that plaintiff in error had been repeatedly seen by the said witness undressed and in bed with a number of dif-

ferent men during the very time that she alleges that she was the common-law wife of G. M. D. Grigsby, deceased. This witness testified: "Men would come to that house and retire with the girls to their rooms, and Mrs. Stallcup (meaning the plaintiff in error) would charge for the room $2 for a while or $3 for all night. The men would pay that fee. They gave their money for it. Sometimes they would pay the money direct to Mrs. Stallcup, sometimes they would pay it to the girls. I have paid Mrs. Stallcup room rent under such conditions." A. I. Jones testified that on the 4th of October, 1905, some six months after the alleged date of the marriage of plaintiff to G. M. D. Grigsby, that he, as notary public, took the acknowledgment of the plaintiff to a deed of trust, which instrument was afterwards introduced in evidence; that on said date she acknowledged the said instrument under the name of Jessie Stallcup and stated to the witness that she was a feme sole. D. A. Frank, attorney at law, testified that he examined an abstract of title to certain property owned by plaintiff which she wished to sell to Mr. Frank's client, known as No. 408 Wood street, Dallas, Tex.; that the abstract showed title to be vested in Mrs. Jessie Stallcup; that about the 8th of May, 1908, he informed the plaintiff that he would have to be furnished with some evidence of her identity before he would pass the title to the property as being good in her, and whereupon the plaintiff told him that her name was Mrs. Jessie Stallcup, and she furnished witness with a copy of a decree of divorce granted to her in Illinois. The witness proceeded: "I asked her the direct question if she had been married to any other man, and she told me that she had not, but that she was the divorced wife of Stallcup, and I wrote out the deed that way, calling her a feme sole." There was also testimony to the effect that G. M. D. Grigsby was a man of more than ordinary business sagacity; that he had accumulated a fortune and was a man of large affairs; that he had extensive and intimate acquaintance with the business men of Dallas and Northeast Texas, several of whom testified that since the death of Mrs. Grigsby in 1904 they had never heard him say or intimate in any way that he was a married man. This and the other testimony adduced, notwithstanding the positive statement of the plaintiff that she and G. M. D. Grigsby in April, 1905, were married by mutual agreement and thereafter lived together as husband and wife, was clearly sufficient to raise the issue whether or not the plaintiff and the said Grigsby did in fact, on or about the date mentioned, agree, as claimed by plaintiff, to take each other as husband and wife, and in pursuance of such contract thereafter live together as such.

[2] The issue being raised, it became the court's duty to submit it by appropriate instructions for the determination of the jury.

[3] That a marriage contract is entered into in good faith and binds the parties to keep themselves separate and apart from all others and cleave to each other during their joint lives are among its essential elements, and a mere agreement to be husband and wife without the present intention then and there to assume that relation does not constitute a marriage between the parties. The facts and circumstances of this case were amply sufficient to warrant the jury in concluding that, even though there may have been some sort of an oral agreement between the plaintiff and Grigsby that they would be husband and wife, yet such agreement was not made in good faith with the intention of in fact assuming that relation.

[4] Of course whatever agreement the plaintiff and Grigsby may have entered into during the lifetime of the latter's wife with reference to assuming the marriage state was absolutely void, and the overwhelming preponderance of the evidence, if not the undisputed evidence, is that, at the time the asserted contract of April, 1905, was made and thereafter up to the time of Grigsby's death, the plaintiff was a prostitute, plying her trade as such, and the mistress of a notorious assignation house or house of prostitution, and that she continued her life of shame during the entire period of her alleged married life with Grigsby and at the very place she says was their home. This course of conduct on the part of the plaintiff is so absolutely inconsistent with the idea that she, in good faith, entered into an agreement with Grigsby to be his lawful wife, and that a man of Grigsby's social and financial standing should have taken as his wife such a woman and lived with her under such circumstances as such, is so inconsistent with the sanctity of the marriage relation, is such an enthronement of "lewdness in the position sacredly held by the lawful wife and mother" that the verdict of the jury declaring that the plaintiff and G. M. D. Grigsby were not in good faith husband and wife is not at all surprising.

The court charged the jury as follows: "The court instructs you that a common-law marriage is legal and valid under the law of Texas, and neither the issuance of license or ministerial or official marriage ceremony is necessary to constitute a lawful and binding common-law marriage. All that is necessary to constitute such a marriage is that if the parties mutually agree and consent together to become husband and wife, and thereafter carry out that agreement and live and cohabit together as husband and wife, the marriage would be valid under our law. If you find and believe from the evidence that the plaintiff and the deceased, G. M. D. Grigsby, on or about the 10th day of April, 1905, mutually consented and agreed together with each other to become husband and wife with the intention at that time of living and

cohabiting with each other as husband and wife, and that in pursuance of such agreement, if any, they did professedly live and cohabit together as husband and wife, you will find for the plaintiff that she was the common-law wife of the deceased, G. M. D. Grigsby. If, however, on the other hand, you fail to find that plaintiff and. deceased, G. M. D. Grigsby, mutually consented and agreed together with each other to become husband and wife on or about April 10, 1905, or if you find that plaintiff and deceased, Grigsby, did professedly live and cohabit with each other as husband and wife in pursuance of such agreement, if any, you will find for the defendant, Eliza J. Reib." The correctness of these instructions is called in question by the second and third assignments of error. It is contended that they are erroneous because: (1) To constitute a common-law marriage it requires only the agreement of the man and woman to become then and thenceforth husband and wife, whereas the instructions complained of not only required the jury to find, in order to return a verdict in favor of the plaintiff, that such an agreement was entered into between the plaintiff and G. M. D. Grigsby, but in addition thereto that they thereafter, in pursuance of such agreement, professedly lived and cohabited together as husband and wife. That, "in order to constitute a valid common-law marriage where the parties have mutually agreed and consented together to become husband and wife, it is immaterial as to whether the husband and wife either carried out the agreement or whether they either lived or cohabited · together as husband and wife. (2)· That professedly living together as husband and wife and doing acts in pursuance of a marriage relation are only evidences of a marriage, and constitute no part in completing the marriage, and the instruction calling the jury's attention to said facts and directing the jury that, unless they found such fact or facts to exist, they would return a verdict finding that there was no marriage, is an affirmative and positive error, as summing up too many prerequisite facts to a verdict, and is a charge upon the weight of the evidence, giving undue prominence, force, and effect to each of said facts.

The court did not err in. giving these charges, especially in view of the facts of this case. Speaking of the requisites of marriage at common law, it is said: "All that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations."

[5] In pursuance of this rule, it is held that a valid common-law marriage may be constituted by a mutual agreement between two parties, who are both capable of entering into marriage, whereby they presently undertake and contract to become husband and wife and mutually promise to continue that relation permanently, and thereupon assume their duties and cohabit together. 26 Cyc. pp. 837, 838; Ingersoll v. McWillie, 9 Tex. Civ. App. 543, 30 S. W. 56; Edelstein v. Brown, 95 S. W. 1129; Cartwright v. McGown, 121 Ill. 398, 12 N. E. 737, 2 Am. St. Rep. 105; Klipfel v. Klipfel, 41 Colo. 40, 92 Pac. 26, 124 Am. St. Rep. 99; Pegg v. Pegg, 138 Iowa, 572, 115 N. W. 1027; Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Dec. 245; Tartt v. Negus, 127 Ala. 301, 28 South. 713. Now, while marriage is a civil contract, and it has been frequently said that all that is essential to its validity is a present agreement between competent parties to take each other for husband and wife, and that such an agreement may be proved by circumstances, such as the cohabitation of the parties, their reception among friends, common reputation, etc., yet the implication at least, in the authorities cited, is to the effect that living together and cohabitation in pursuance of such a contract is essential to its validity, and no case has come under our observation in which it was held that a mere agreement between a man and a woman to be husband and wife, without the assumption of that relation, constituted a valid common-law marriage between the parties. In all the cases we have examined in which it was held that, in order to constitute a valid common-law marriage, it was only necessary to show a present agreement to take each other for husband and wife, it appeared that the parties had in fact assumed their marital duties and obligations. In the case of Simmons v. Simmons, 39 S. W. 639, cited and relied on most strongly by appellant, it is said: "It (the evidence) shows, without contradiction, that the parties agreed to marry, and that they thereafter lived together, recognizing and treating each other as husband and wife."

[6] But, aside from this, we do not understand that a charge, as in the present case, which conforms to the theory of the party asserting a common-law marriage as a basis for the right to recover, and to the evidence adduced in support of that theory, is erroneous. The plaintiff testified, in effect, that she and Grigsby mutually agreed in April, 1905, to then and thenceforth be husband and wife, and in pursuance of that agreement thereafter lived and cohabited together as such. Her testimony was as full and emphatic to the effect that she and Grigsby lived and cohabited together after entering into the agreement to take each other for husband and wife, as it was that such agreement was entered into. The jury could not therefore have been misled to her prejudice by the instructions of the court. If they had believed that such an agreement was entered into in good faith between

plaintiff and the said Grigsby, it is altogether improbable that they would not, upon testimony coming from the same source and of the same probative force, strengthened, as plaintiff claims, by corroborating circumstances, have believed that she and Grigsby lived and cohabited together as husband and wife. That the jury did not credit the testimony of the plaintiff touching the alleged contract of marriage with Grigsby is shown by their verdict, and we think it logically follows that she suffered no injury by reason of the charges under consideration.

The seventh assignment of error complains of the court's refusal to give plaintiff's special charge No. 1. This special charge purports to cover all the law applicable to the facts of the case. The first paragraph thereof, among other things, tells the jury "that by the words common-law marriage is meant an agreement of a man and woman to become then and thenceforth husband and wife," omitting, as nonessential, "living and cohabiting together as such." The third paragraph is to the effect that while the jury could not consider any conduct, agreement, or acts on the part of the deceased, G. M. D. Grigsby, and the plaintiff for the purpose of establishing any marriage relation between them during the lifetime of Mrs. G. M. D. Grigsby, deceased, yet they could look to any acts, conduct, and agreement by and between the said Grigsby and plaintiff, at any time, either before or after the death of Mrs. G. M. D. Grigsby, in passing upon the question as to whether or not G. M. D. Grigsby did or did not enter into a marriage agreement or relation with the plaintiff. This paragraph of the charge is believed to be erroneous, and, as the special charge was requested as a whole, it was properly refused.

[7] The general rule in this state is that the court must give a requested charge without change or modification, and while the court, "where the charge asked consists of several separate subdivisions, defining as many distinct and supposed necessary conditions of fact to be found by the jury," etc., and one of such subdivisions is not the law as applied to the facts, may eliminate such subdivision and give the special charge so modified, and the same will not be reversible error, yet the court is not required to make the modification and give the remaining portions of the charge in the terms asked.

[8] The plaintiff testified that before the death of Mrs. G. M. D. Grigsby she and Grigsby agreed to be husband and wife, and in pursuance of that agreement lived and cohabited together. Such an agreement made at that time was void, and, being void, could not be considered by the jury in determining whether or not the said Grigsby entered into a marriage contract with the plaintiff after the death of Mrs. Grigsby. Nor could the acts and conduct of the plaintiff and the said Grigsby, before Mrs. Grigsby's death, in pursuance of such agreement, be considered by the jury in determining whether or not plaintiff and the said Grigsby agreed after the death of Mrs. Grigsby to take each other as husband and wife.

The assignments of error relating to the admission of testimony bearing upon the general reputation of the plaintiff as a prostitute and of the house kept by her, which she says was the home of herself and Grigsby during the time she claims to have been his wife, as a house of prostitution, will be overruled.

[9] We are of the opinion that in a suit like this, where a common-law marriage is sought to be established as a basis for a recovery, the character of the woman, her general reputation for chastity, and the general reputation of the house in which she claims to have resided with her alleged husband, with respect to whether or not it was an assignation house or house of prostitution, are matters of legitimate inquiry, and the evidence in relation thereto competent to be considered by the jury in determining the question of marriage vel non. There was no error in refusing to admit in evidence so much of the testimony by deposition of George A. Staley, as assumed that this house, No. 408 Wood street, kept by plaintiff, which bore the reputation of being an assignation house, was the house of G. M. D. Grigsby.

[10] The assumptions and conclusions of fact of a witness (unless he is an expert) are not admissible in evidence. Such was the character of the testimony of the witness Staley, and his conclusion or assumption seems to have been predicated solely upon the fact, as stated by him, that he met and talked with Grigsby at the house in question. This was not sufficient to entitle him to speak in his testimony of that house as the home of Grigsby.

Nor did the court err in admitting in evidence the will of G. M. D. Grigsby, deceased, and the order of the county court of Dallas county, Tex., admitting said will to probate. Appellant contends that an appeal was taken from the order of the county court admitting the will to probate to the district court of said county, and that in the latter court the suit was dismissed, the effect of which was to vacate the decree of the county court probating the will. The record discloses that the will was duly admitted to probate September 26, 1906; that nearly two years thereafter, and on, to wit, September 7, 1908, the plaintiff, claiming to be the surviving widow of G. M. D. Grigsby, filed a petition in the county court of Dallas county to annul the order probating said will; that on the 10th day of October, 1908, plaintiff filed a petition in said court to withdraw the estate of the said G. M. D. Grigsby from administration; that on October 27, 1908, the county court made and entered an order reciting, in substance, that on that day

came on to be heard the application filed September 21, 1908, in the name of Jessie Stallcup Grigsby (plaintiff in this suit), praying for an allowance in lieu of exempt property, and that there came on to be heard the application of Jessie Stallcup Grigsby to withdraw the estate of G. M. D. Grigsby from administration; that the court being of the opinion, after hearing the evidence, that the applicant had failed to show any interest in the estate of G. M. D. Grigsby, deceased, it is adjudged and decreed that said applicant take nothing by said application, and that D. J. Grigsby, executor of the estate of G. M. D. Grigsby, recover judgment against applicant and sureties on her cost bond for costs incurred by reason of said application. The order further recites the following: "To the judgment on each of said applications the applicant excepts and gives notice of appeal." It further appears that the appeal bond, given to remove the proceedings to the district court, simply recites that the appeal is taken from the judgment of the county court denying the plaintiff's applications praying respectively for an allowance in lieu of exempt property and to withdraw G. M. D. Grigsby's estate from administration; that in the district court appellant appeared and in open court declined to prosecute her suit, and the same was dismissed.

[11] It thus appears that the application of the plaintiff, Jessie Stallcup Grigsby, to annul and set aside the order probating the will of G. M. D. Grigsby, and the applications to withdraw said estate from administration and to make plaintiff an allowance in lieu of exempt property, were separate and distinct proceedings filed at different dates, and that no appeal was taken from the judgment of the county court refusing to set aside and annul its former order admitting to probate the will of G. M. D. Grigsby. This being true, the judgment of the district court dismissing the appeal from the other orders could in no sense affect the judgment probating said will.

[12] But we are of opinion that if it can be said that an appeal prosecuted from the orders of the county court denying plaintiff's applications filed in that court to withdraw Grigsby's estate from administration and to make an allowance to plaintiff in lieu of exempt property had the effect to call in review, in the district court, the county court's action in refusing to annul its judgment probating Grigsby's will, still the judgment of dismissal in the district court did not have the effect to vacate said judgment of probate. The judgment probating the will was not disturbed by the order of the court appealed from, but, on the contrary, was sustained and upheld by that order, and the judgment of dismissal in the district court had the effect only of dismissing

plaintiff's suit, which she announced she would no longer prosecute, seeking the annulment of the judgment probating the will, leaving said judgment in full force and effect. What would have been the effect of her appeal from the judgment itself probating the will and a dismissal of the suit after it reached the district court we need not decide.

All the assignments of error have been carefully considered. None of them, in our opinion, show reversible error, and the judgment of the lower court will be affirmed. It is, accordingly, so ordered.