STATE OF IOWA, Appellee, v. JAMES GRIMES, Appellant.

No. 41471.

APRIL 4, 1933.

Yeaman & Yeaman, for appellant.

Edward L. O'Connor, Atty. Gen., Walter Maley, Asst. Atty. Gen., and Ralph Prichard, Co. Atty., and Ray Kenaston, and E. J. Fribourg, Asst. Co. Attys., for appellee.

ALBERT, J.—On the 23d day of February, 1928, the defendant, James Grimes, and Margaret L. Murray were duly married at Sioux City, Iowa. On the 31st day of March of the same year a petition was filed by Margaret Grimes against James Grimes asking an annulment of this marriage on the ground that James Grimes was not a single man at the time she married him. On April 6, 1928, a decree was entered annulling the marriage. Margaret then went to her former home in Massachusetts, and later, in July, 1931, she returned to Sioux City, bringing with her her son, and she and Grimes took an apartment consisting of three rooms, where they set up housekeeping on the representation of Grimes to her that the annulment of their marriage was not legal. They were occupying said apartment at the time charged in the indictment.

The basis of the charge of adultery in this indictment is founded on a claim that at and before the marriage with Margaret, and at the time alleged in the indictment, the defendant was the common-law husband of one Mae Govers, and had been such since 1924. The crucial question in the case is whether or not this common-law marriage existed at the time charged in the indictment.

Evidence on the part of the state tends to show that the relation between defendant and Mae Govers commenced in 1924, and the jury might find from the evidence that they lived together and cohabited until some time in February, 1928, when Mae Govers saw a notice of this marriage between the defendant and Margaret Murray in the newspaper. After the decree in the annulment case, Mae Govers says that Grimes moved back to her home and remained there with her until Margaret Murray returned from Massachusetts in July, 1931, when he again left and established a home with Margaret.

As a basis for the alleged common-law marriage, a written contract was introduced in evidence reading as follows:

"Sioux City, Iowa,

"Thursday, April 17, 1924

"We the under Signed. James Grimes and Mae Govers do hear by agree to live as Husband and Wife untill such time that we are Lawfully married and I Mae Govers reserves the right to use the name of Mrs. James Grimes or Mae Govers as I Prefer. untill we are Lawfully Married.

"[Signed]    James Grimes

"Mae Govers."

There is a dispute in the testimony as to when this writing was signed by the defendant, but from all of the testimony it is quite apparent that it was not signed at the time it bore date. Mae Govers testified that it was drawn up by her in 1928, and dated back at the request of the defendant. The actual date of the signing is somewhat uncertain, but the jury were authorized to find that it was somewhere between the 3d and 7th of February of that year. She testified in relation to the same "their marriage was annulled I think on the 9th of April. That (the contract) was made out after the annulment." The question at this point is, Is this writing a sufficient foundation on which to base a common-law marriage?

In the case of Pegg v. Pegg, 138 Iowa 572, loc. cit. 575, 115 N. W. 1027, 1028, this court said:

"It must be conceded that the voluntary signing of a written instrument of agreement to regard each other as husband and wife does not alone create the relation of marriage between a man and a woman. * * * We recognize so-called common-law marriages as valid; but for such a marriage to be valid there must be a present agreement to be husband and wife, followed by cohabitation as such. * * * That a mere written or oral agreement to be husband and wife, without present intention to assume that relation in fact, does not constitute a marriage between the parties, especially if the agreement is entered into for some other purpose, is well settled."

Contracts of this character may be per verba de praesenti; that is, where the parties take each other in the present tense, implying that the marital relation is constituted immediately, and contracts per verba futuro, which implies no more than the parties will marry each other at a later time. Contracts of the former sort, when duly acted upon, create a valid marriage; while words evidencing only

the intention to be married *in futuro* are ineffectual even where followed by cohabitation. This distinction is marked out in the Pegg case, supra, and seems to be quite the universal rule. See 38 C. J. 1319.

In the Pegg case, supra, the substance of the written agreement was that "each party this day takes the other party to be his spouse". That case was one in which the agreement was that on the signing of the writing, the marriage,—so far as the contract was concerned,—was at that instant consummated. In other words, it was not a contract to be married in the future; their intention being that they would then and there assume the marriage relation, and the marriage contract was completed. This line of authority is the basis of the following cases: Love v. Love, 185 Iowa 930, 171 N. W. 257; In re Estate of Wittick, 164 Iowa 485, 145 N. W. 913; Blanchard v. Lambert, 43 Iowa 228, 22 Am. Rep. 245.

In re Estate of Medford, 197 Iowa 76, 196 N. W. 728, we held that mere proof of cohabitation is not a sufficient foundation for a holding that a common-law marriage existed.

In re Estate of Boyington, 157 Iowa 467, at page 476, 137 N. W. 949, 952, we held:

"It is well settled that, where cohabitation is in its beginning illicit, affirmative proof of a subsequent present intention to change that relation into the legitimate relations of husband and wife is essential to establish a marriage."

These rules seem to be quite well-settled in this state. Turning now to the writing above set out, and analyzing the same, we find that the parties "do hereby agree to live as husband and wife". What does this mean?

In re Foley's Estate, 76 Colo. 286, 230 P. 618, loc. cit. 620, it is said:

"An agreement to live together as man and wife has been held not to be marriage. Letters v. Cady, 10 Cal. 533. It is open to the interpretation of an illicit relation resembling that of marriage."

This agreement does not carry on its face the required element of a present intention to assume the legal relation. The agreement further proceeds:

"Until such time that we are lawfully married."

This portion of the agreement, taken in connection with the other part, indicates that there was no intention at the time of the signing of the same to consider it a marriage because the last clause negatives the idea of a lawful marriage, or shows an intention that the relations they assumed were not those of a lawful marriage. In other words, the contract, taken as a whole, on its face shows that whatever the relations were that were entered into by these parties, based on this contract, were understood by both not to be a lawful marriage. It necessarily follows from this conclusion that, therefore, so far as this contract is concerned, the state has not established its claim that Mae Govers was the common-law wife of the defendant.

It is to be further said that the relation between Mae Govers and the defendant was commenced in 1924, and this alleged contract was not signed (if it were signed) by the defendant and Mae Govers until some time in 1928 or 1929. At the most it could only be evidence as admissions of the parties, and could not be a basis for claiming a common-law marriage as to matters which occurred prior to the time it was actually made.

It is suggested on the part of the state, however, that there are other and further facts introduced by the state, aside from this contract, which made a question for the jury on the whole record as to whether or not a common-law marriage existed. Without setting out the details of these matters, we have scanned the record with care and are unable to find sufficient facts of the existence of the relation of a common-law marriage to make a jury question. From a reading of the record in the case as it was tried in the lower court, we think this last contention was an afterthought. We think the court erred in sending this case to the jury.—Reversed.

KINDIG, C. J., and EVANS, STEVENS, MITCHELL, DONEGAN, and ANDERSON, JJ., concur.

UTTERBACK, J., dissents.

UTTERBACK, J. (dissenting).—I am unable to agree with the majority opinion, and therefore must dissent.

The majority opinion is based upon the finding that the alleged common-law marriage was not established by the alleged contract Exhibit A, which is set out in full in the opinion; and that there were no other sufficient facts and circumstances shown in the record

to warrant a submission of the question of the existence of a com-mon-law marriage to the jury.

I have carefully read the full record in the case and find that it is necessary to set out herein, other and further matters than those set out in the majority opinion in order to discuss the ques-tions raised in the case; particularly the question of whether there was sufficient substantial evidence of an existing common-law mar-riage between the prosecuting witness and the defendant, on or about July 14, 1931, as charged in the indictment, to support the verdict of the jury that the defendant was guilty of adultery.

In January, 1932, the appellant and one Margaret L. Murray, were jointly indicted for the crime of adultery alleged to have been committed in Woodbury county on or about the 14th day of July, 1931. The appellant alone was tried in this case.

The indictment is founded on the claim that the prosecuting witness was the common-law wife of the appellant; that the case was commenced by her as his wife, and that he had had sexual intercourse with said Margaret L. Murray on or about the 14th day of July, 1931, in Woodbury county, Iowa, all as set out in the indictment, and also in the instructions given by the court to the jury.

It appears that the relations between the appellant and the prosecuting witness commenced in 1924; that they were never formally married; and that they occupied the same premise from 1924 until February 23, 1928, at which time the appellant left the home of the prosecuting witness and married said Margaret L. Mur-ray. They obtained a marriage license from the clerk of the district court of Woodbury county. The marriage was solemnized by a minister, and they began living together as husband and wife.

Some days thereafter, the prosecuting witness, learning of their marriage, consulted Attorney E. E. Baron of Sioux City about the matter of securing annulment of the defendant's marriage to said Margaret L. Murray, claiming that she was the common-law wife of the appellant. After conferences with all three parties, Mr. Baron, on March 31, 1928, as attorney for said Margaret L. Murray, filed a petition against the appellant in the district court of Woodbury county, asking annulment of her marriage to him, on the ground that he was not a single man at the time she married him.

The record shows that original notice was served upon the appellant in the annulment case; that he entered his appearance per

se; that he waived time of hearing; that the case was tried in district court of Woodbury county, Iowa, and decree was entered on April 9, 1928, annulling the marriage on the ground that the appellant was the common-law husband of the prosecuting witness herein. The decree at the time was apparently satisfactory to all parties concerned. No appeal was taken to this court.

The record further shows that five days thereafter, to wit, on April 14, 1928, the appellant returned to the home of the prosecuting witness and that thereafter, for a period of almost three years, occupied the same premises; that on the 7th day of May, 1928, said Margaret L. Murray left Sioux City and returned to her former home in Massachusetts where she remained until in July, 1931, at which time she returned to Sioux City with her son, and that thereafter the appellant and said Margaret L. Murray and her son lived together in a three-room apartment in Sioux City, which the appellant rented.

Among other things, witnesses for the state testified that from and after April 14, 1928, the prosecuting witness and the appellant lived together as husband and wife until January, 1931, when the appellant left the home; that the prosecuting witness thereafter used the name "Mrs. Grimes"; and that they were known by neighbors and friends as Mr. and Mrs. Grimes.

The appellant denies that he ever lived with the prosecuting witness as husband and wife; that he was served with notice of the annulment suit; that he entered his appearance per se; and that he signed waiver of time of hearing. He states that he was simply a boarder and roomer in the home of prosecuting witness, and denies that he had sexual relations with said Margaret L. Murray, as alleged in the indictment.

There was offered in evidence during the trial of the case an alleged agreement of marriage, dated April 17, 1924, signed by James Grimes and Mae Govers. The exhibit is set out in full in the majority opinion. The defendant denies that he ever signed said agreement. The prosecuting witness claims that the agreement was made in 1928 at about the time of the annulment proceedings, and that same was signed by herself and appellant at that time. Attorney Baron testified that said Exhibit A was presented to him by the prosecuting witness when she came to his office to consult with him about the annulment of the marriage of the appellant to said Margaret L. Murray.

It is the claim of the appellant that there was no common-law marriage; that the judgment and decree of the court in the annulment case was void; and that there was not sufficient evidence to show adultery.

I. The first question here presented is: Was there a common-law marriage between the appellant and the prosecuting witness at the time charged in the indictment, to wit, on or about July 14, 1931?

From the foregoing statement respecting matters shown by the record, it is clear that there is not a little conflict in the evidence offered upon the trial. The state's witnesses testified to the circumstances above set out, and the appellant denied, among other things, that he ever signed the said Exhibit A; that original notice was ever served upon him; that he entered his appearance per se; that he waived time of hearing; and that he had sexual relations with said Margaret L. Murray as stated in the indictment.

This court has long recognized so-called common-law marriages as valid, but for such a marriage to be valid there must be an agreement between the parties to live together as husband and wife, followed by cohabitation as such. See Pegg v. Pegg, 138 Iowa 572, 115 N. W. 1027. Proof of cohabitation alone is not sufficient to constitute a common-law marriage. See In re Estate of Medford, 197 Iowa 77, 196 N. W. 728.

The trial court correctly instructed the jury that, "to constitute a marriage valid at common law, it is not necessary that it should be solemnized in any particular form or with any particular right or ceremony. All that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation permanent and exclusive of all others, between parties capable of making such a contract, consummated by their cohabitation as man and wife, or mutual assumption by them of marital duties and obligations." See Instruction No. 8. See, also, 38 Corpus Juris, 1316.

The majority opinion rests this case almost entirely upon their finding that the alleged contract, Exhibit A, is not sufficient, under the prior holdings of this court, to constitute a common-law marriage. It will be conceded that if the question of whether or not there was a common-law marriage existing between the prosecuting witness and the appellant herein on and prior to July 14, 1931, rested entirely upon the alleged contract Exhibit A that then and in that event the evidence would not be sufficient.

In this case, however, the state offered other and additional testimony than said Exhibit A. Under the record in the case, said Exhibit A might be entirely ignored and there still be sufficient competent evidence to warrant the submission of the case to the jury. In this case there was evidence of a present intention of the parties to assume, if not to resume, the marriage relation on or about the 14th day of April, 1928, when the appellant returned to the home of the prosecuting witness within five days after the entering of the decree; that thereafter they were known to neighbors and friends, as "Mr. and Mrs. Grimes"; that thereafter they lived together as husband and wife until in January, 1931, when the appellant left the home of the prosecuting witness and arranged for the return of said Margaret L. Murray, rented a three-room apartment; and that in July, 1931, the appellant and the said Margaret L. Murray returned to Sioux City, resumed the marriage relation, claiming that the annulment proceedings in April, 1928, were null and void.

The testimony of the prosecuting witness respecting these matters was corroborated by neighbors and friends who testified, among other things, that after April 14, 1928, the prosecuting witness and the appellant lived together in the same premise for almost three years; that they were known as "Mr. and Mrs. Grimes"; and that thereafter the prosecuting witness went by the name of "Mrs. Grimes".

Under all the facts and circumstances shown in the record, was there a jury question? To me, the undisputed conduct of the appellant during the years, and the state's evidence of the alleged common-law marriage, is persuasive. I am of the opinion that there was sufficient, substantial, material evidence to justify the court in submitting to the jury the question of whether there was a common-law marriage between the prosecuting witness and the appellant at the time charged in the indictment. I find no error either in the record or in the instructions given by the court.

II. It was contended by the appellant that the judgment and decree in the annulment case was void. It is only necessary to note that the decree was entered on the 9th day of April, 1928, and that no appeal was ever taken therefrom. Evidently the decree was satisfactory to all parties at the time, and was accepted as such. This is evidenced by the fact that the appellant and said Margaret Murray at once discontinued living together; that five days after the decree, the appellant returned to the home of the prosecuting wit-

ness and thereafter occupied the same home with her for a period of approximately three years; and that the said Margaret Murray on the 7th day of May, 1928, left Sioux City and returned to her former home in Massachusetts. In our opinion there is no merit in the contention of the appellant that the annulment decree is void.

III. The other contention of the appellant is that there was insufficient evidence to prove any sex relationship between the parties. There is no direct evidence of any sex relations. Both the appellant and said Margaret Murray testified that there had been no sex relations. They admitted that they had occupied the same apartment. They claimed that they had occupied separate beds at all times. Their testimony in this regard was corroborated by the fourteen-year-old son of Margaret Murray.

The state relied upon circumstantial evidence to establish the guilt of the appellant.

The record shows that when said Margaret Murray returned to Sioux City, the appellant took her to the home of Mr. and Mrs. Royalty, where he had secured an apartment for them. Mr. Orlando Royalty testified that the appellant and Margaret Murray had lived in his house for nine months as husband and wife; that they had three rooms there; and that the appellant had told him that Margaret Murray was his wife. Mrs. Orlando Royalty testified that the appellant was rooming at her home before Margaret Murray came on or about July 3, 1931, and that they had lived there since that time; that they had three rooms, to wit, two bedrooms and a kitchenette; one room being downstairs, and two upstairs; and that she believed them to be husband and wife.

In the case of State v. Rounds, 202 Iowa 534, 210 N. W. 542, 543, this court, in discussing an instruction on circumstantial evidence in a case of this kind where the defendant had been convicted of the crime of adultery, said:

"A statement in connection with the instructions on circumstantial evidence, to the effect that the crime of adultery was one of secrecy and darkness, and could seldom be established by direct evidence of the overt act, and that it was not necessary to so establish it, but it might, and generally must, be established by circumstantial evidence, was not improper."

Under the rule above stated, direct proof of the act of sexual intercourse is not required. The question was one for the jury.

The court submitted the question in proper instruction as to circumstantial evidence, and the jury found that such sexual relationship did exist.

I am of the opinion that there was sufficient substantial evidence to support the verdict, both on the question of there being a common-law marriage, and on the question of the sexual relations of appellant with said Margaret L. Murray, as alleged in the indictment.

I find no error in the case, and believe that the judgment of the trial court should be affirmed.