## SARAH F. CROSS v. DONALD CROSS.

*Proof of marriage by reputation—Testimony of parties to divorce suit—Costs.*

1. A woman claiming to be married and seeking a divorce cannot be examined as a party except in open court, without defendant's consent (How. Stat. § 6260), whether she is really his wife or not.

2. An intimacy between a man and his housekeeper is not of itself evidence that they are married. And so long as their relations are such that the fact of marriage continues to be seriously questioned, it cannot be considered as established by reputation.

3. In proving marriage, reputation is important only as circumstantial evidence as to whether the parties themselves regarded each other as husband and wife.

4. Costs in equity are not of absolute right; and on dismissing a divorce bill filed by a woman who could not prove a marriage, but with whom defendant had lived in intimate relations, both parties were left to pay their own costs.

Appeal from the Superior Court of Detroit. (Chipman, J.) October 21.—November 19.

Divorce bill. Defendant appeals. Reversed.

*George W. Bates* for complainant. Marriage is proved by the contract followed by cohabitation : *Hutchins v. Kimmell* 31 Mich. 131 ; Bish. Mar. and Div. §§ 52, 528 ; and in civil cases, except for seduction, by reputation, declarations and conduct : 2 Greenl. Ev. § 462 ; *Proctor v. Bigelow* 38 Mich. 282 ; *Peet v. Peet* 52 Mich. 464 ; even where the cohabitation was at first meretricious : *Fenton v. Reed* 4 Johns. 52 ; *Caujolle v. Ferrie* 23 N. Y. 90.

*Otto Kirchner* for defendant.

CAMPBELL, J. Complainant having filed a bill of divorce alleging marriage and various acts relied on as statutory grounds of cruelty, and abandonment without provision, defendant put in a plea denying the marriage, and issue being joined on this, complainant prevailed and the case was ordered to proceed to answer. Defendant appeals.

The bill avers a regular marriage in Sandwich, Ontario, on May 17, 1881, both parties living in the township of Spring-wells near Detroit, and a reason for marriage in Canada being stated to be a desire to keep it from the knowledge of defendant's family. It is set out that they at once assumed and continued marital relations, first in his house, then in her father's house in Springwells and in the town of Van Buren, and lastly, from the fall of 1882 until some time in March, 1883, on Spruce street, in the city of Detroit, where they kept house until he abandoned her. It also avers the birth of a son in the spring of 1882, and that at the Spruce-street house she was induced, for the purposes of concealment before mentioned, to assume the name of McDonald, although informing other people that Cross was her husband. The bill finally sets up attempts by defendant to induce complainant to give the child away, and afterwards to get her to charge the paternity upon a gentleman in Belleville, which was finally done by a paper which she was deceived into signing by the effect of wine and of misrepresentation as to its contents, but which she repudiated when discovered.

The plea being a denial of an essential part of complainant's case, the burden was on her to prove the marriage to the satisfaction of the court, in accordance with the allegations. The testimony was all taken before a commissioner, and both parties were sworn, complainant's personal testimony being objected to as unwarranted, but no objection being taken to defendant's. No testimony was taken in open court.

As complainant comes before the court asserting herself to be a married woman, and was sworn without defendant's

consent, she was within the prohibition of Comp. L. § 4772, of the divorce law as amended in 1883 (How. Stat. § 6260), which declares that parties shall only be examined in open court. If not married she has no case, and she cannot be sworn under claim of being married, in violation of the statute. Defendant's testimony is not objected to, and could not be ruled out on this preliminary question without deciding it against him. Any admissions made by either would stand on a separate ground.

No marriage certificate is shown, and no proof was made of the Canadian marriage, either by the persons said to have been present at it, or by documentary evidence from the officer, or from any Canadian record. No mention is made of the name of the magistrate or of the witness, and no difficulty seems to be alleged and none definitely proved as to getting direct proof, if it existed. The laws of Canada have not been proved, to show whether a justice could marry parties there. The bill does not purport to rely on any but a valid Canadian marriage. She claims to have been engaged a year, but no proof except hers is introduced to show it.

If we could look at complainant's testimony, it shows no more than the appearance of the parties before a respectably appearing man called a justice, and a witness, with no mention of their names, or other means of identification, and no tangible reason why such names can not be given, and no statement why, if unknown, they were not learned. This would be very unsatisfactory evidence in any case; but, leaving it out, there is no proof at all of the Canadian marriage, or of any definite marriage at any ascertained time or place.

Reliance is, however, had—although such is not the theory of the bill—on a common-law marriage by consent and matrimonial conduct, and this is sought to be proved by acts, repute and admissions.

If any such marriage existed, it is still claimed to have been at the time mentioned in the bill, and there is no attempted proof of any other. All the alleged acts and admissions are made significant only as retrospective.

This makes it proper to consider the surroundings. Previous to the spring of 1881 defendant was keeping house over his butcher shop, with several children, mostly grown up, or nearly so, including a son and various daughters. There is some not very clear testimony about a housekeeper who had some peculiar difficulty with him, either before or afterwards, or both, but who was not in the house during complainant's sojourn. Defendant was a dealer in cattle and meat. Complainant came into his house and employ in some capacity, apparently as housekeeper, early in the year, and in the lodging arrangements complainant lodged with the daughters, defendant had a room by himself, and his son and a hired man another. This arrangement continued precisely after as before the alleged marriage, so long as complainant remained in the house, which was until September. Her parents lived quite near, and had a large family, housed about as closely in a few rooms as defendant's inmates.

There is no testimony but complainant's which has any tendency to show that during this period, from the alleged marriage to the return to her father's, complainant and defendant had any marital relations whatever, or were supposed to have. According to the theory of the bill the marriage was to be kept from the family, and any publicity would prevent this. But if complainant's story is to be looked into, it indicates that there were acts not seriously sought to be concealed which would indicate the reverse of honest relations to any one not informed of a marriage, with no question or allusion on the part of daughters whose character is not impugned on the record. Without other proof of marriage these relations do not lead to evidence of it.

In September complainant left her alleged husband's house and went back to her father's. The reason she gives is a dispute with defendant's son, not quite grown up, about the pay of her brother for wages. That a wife should leave her husband's house on any such account, with no grievance against her husband and no assertion of wifely character, is not a natural course, and this is a circumstance bearing against any inference of marriage from conduct and surroundings, unless

explained and aided by more definite proofs. Defendant's claim is that she never was in his house except as in service, and that she left because her employment was terminated.

All the remaining testimony for complainant is made up of conduct of defendant and repute.

From September, 1881, she lived at her father's, a few rods distant, and in March her father and his family went back to Van Buren, where they had formerly lived, and she went with them and remained till November, 1882. A child was born to complainant in April, 1882, seven months or thereabouts after she left defendant's house.

There is testimony from her father and mother, and some other relatives, that during her stay at her father's, Cross lived there a good deal of the time and treated complainant as his wife, and that she was addressed in his presence as Mrs. Cross. There is also some testimony of his admissions of marriage. He did not go with her to Van Buren, and is not shown to have been there to reside, but there is evidence of several persons of his treatment of her as if she were his wife, and his recognition of the child. There is, however, evidence that the question of whether they were married or not was mooted even before the alleged marriage, by reason of her being in defendant's house, and that the same discussions kept up until and after the birth of the child, and that it was then questioned seriously. All of the testimony concerning the open recognition is hardly to be reconciled with the allegations in the bill concerning a desire to keep the matter concealed from defendant's family or his former housekeeper, and any mystery on that account was evidently useless and uncalled for. The contradictions and anomalies in the testimony are very considerable. And the facts concerning the residence on Spruce street cannot be explained consistently with much of the remainder of the case. The statements made by complainant were not uniform. Her name she gave to various persons as McDonald. It does not appear that Cross was ever called by any but his true name. She called him at times her brother-in-law, and at others explained to the land-

lord's wife that he was her husband, but they wished to keep the marriage secret from his children. But the testimony of her parents, if true, showed that he had gone openly with her from his own house, in the fall of 1881, to live with her at her father's, near by, where his children could not possibly have been ignorant of it. It also appears from her father's testimony that at the time she occupied the Spruce-street house Cross told him she had gone away to visit friends West, and that he did not ascertain her real whereabouts for some months. Whatever the facts may have been, it is apparent that there was no time when these parties seem to have lived in such a way as to remove doubts and questions about their relations, and that more or less falsehoods and mystifications were purposely maintained. Both parties have made statements which do not impress us as credible. We have no doubt relations of some intimate character did exist through a considerable period, at times, if not continuously. But we do not feel convinced from any of the oral testimony that they were marital relations.

In the conflict of witnesses there is one class of testimony which should be reliable, if genuine. The complainant avers the existence of numerous documents in the shape of letters and other papers, but produces only two. The defendant also relies on some papers. These will require attention.

In her testimony complainant stated that at the time of her Sandwich marriage defendant wrote upon a paper the day of the week and date of the marriage, and his and her name, with some verses, and gave it to her; that she put it away and had seen it within a month or two before testifying, and then saw it was an old paper and soiled, and did not think it of any account and took no care of it. She had said she had no other marriage certificate, and it is strange and unfortunate that such a paper, if existing, should have been treated so carelessly. But before the case was ended she produced another paper, dated May 21, 1881, four days after the alleged marriage, which is of the same purport and is as follows (except as to orthography): " Springwells, May the 21, 1881.

*Compliments* of your *husband* Donald Cross, to his wife Mrs. Sarah Cross, of Springwells, Mich."

This is definite and would be almost conclusive if genuine. Out of many letters spoken of, one is produced, dated at Springwells on the 5th of some month not named, in 1882, which complainant says was brought her by her brother while in Van Buren. It is signed with defendant's name, and contains affectionate expressions and calls her wife and himself husband. These papers were produced at a late stage in the testimony. She explained the delay by a statement that defendant had her things and she did not know where they were. The testimony on this is not very clear. These are the only specimens of his handwriting in the case, except some writing put in and made before the commissioner at the request of complainant's solicitor, for comparison.

Defendant put in evidence an affidavit sworn to by complainant before a notary in Detroit, who is a member of the bar, dated March 7, 1883, and charging a person in Van Buren township as father of her child. This document is genuine, but complainant says she was deceived as to its contents. There are also some genuine signatures made by herself during the examination and on the record, and some letters which she denies, and the writing of which is the subject of other proof. One of these letters, marked Exhibit D, is dated a few days before the affidavit, and while it sets forth in a natural and somewhat pathetic way her troubles, is entirely inconsistent with marriage, although indicating former relations of another character.

The testimony of all the witnesses who know defendant's handwriting is positive that the exhibits laid to his charge are not in his handwriting. The specimens about which there is no dispute do not at all resemble them. On the other hand, it is equally clear, from a comparison of papers, that the letter and writing charged to him and the letters and other papers charged as hers, are from the same hand, and contain some very singular peculiarities which are found in her genuine and undisputed handwriting. Among these, which are numerous in the longer documents, are the

writing the word " Cross " with two short final letters, instead of a long and short one always found in his signatures as known, and writing the letter *u* with but a single plain mark nearly like an *r*. The capital *W* made by her is peculiar, and is identical in all the papers, both those laid to him and those laid to her. The identity in preparation of the disputed documents on both sides is manifest on even a slight compari- son, and becomes plainer by a close one. There is a uniform use of peculiarly shaped letters seldom formed as they are formed here. There is uniformity in a somewhat peculiar way of writing some capital letters. The word "thought" appears in both sets of letters beginning with an *h* crossed to stand for *th*. The letter *h* is written in both in a singular and uni- form shape. These resemblances are too numerous and too exact to be accidental, and it is impossible not to see that they are all from the same source. Either Cross wrote the papers he lays to her, or she or some one who copied the style of those papers wrote those laid to him which, as already suggested, were not introduced until his documentary proofs were in and had been in for some time.

It is worthy of note that while complainant in her testi- mony denies that she wrote the most significant of these let- ters, Exhibit D, she says that she has seen it before and knows who wrote it, but fails to name the writer.

Upon a review of all the testimony bearing on the question of handwriting and the genuineness of the disputed docu- ments, we are satisfied that complainant wrote the papers which purport to have been written by her. And we are also satisfied from the testimony that she signed the affidavit re- ferred to, voluntarily and with full knowledge of its contents. We are also satisfied that the papers laid to defendant are not genuine.

We cannot avoid the conclusion that whatever these parties may have done to keep up appearances, neither of them ever supposed they were married. Their relations were evidently more intimate than those of unmarried persons should be, but they did not produce, even among strangers and other third persons, any general conviction that they were husband

and wife. The real question is how they themselves regarded their relation, and reputation is only important as circumstantial evidence of this. But here the reputation was always doubtful, and the conduct of the parties such that nothing but complainant's claim that the marriage was to be kept private could account for it all consistently with such a relation. We make no allusion to some portions of the testimony not bearing directly on the fact of marriage, except as to the probability arising from the personal character of the two parties, as we think it unnecessary.

In our opinion the complainant has failed to prove marriage, and the plea denying it is made out.

As costs in equity are not of absolute right, we are disposed, in view of the relations between these parties, to leave both to pay their own costs in both courts.

The decree must be reversed, and the bill dismissed without costs to either party.

The other Justices concurred.