*In re* FREDERICK TERRY's ESTATE.

Argued July 5, 1894. Reversed July 19, 1894.

No. 8908.

**Common-law marriage not proven.**

The evidence in this case considered, and *held* not sufficient to prove a common-law marriage.

**Evidence of such a marriage considered.**

Where it appears that the intercourse between the parties was originally illicit, there being no impediment to marriage, it will be presumed that the intercourse continued to be illicit; and where their subsequent relations appear to be somewhat clandestine, and are kept concealed from relations and all except servants, physicians, and others so employed, who will necessarily discover that the relation is illicit, unless made to believe that the parties are married, the evidence is insufficient to prove marriage. But it is not *held* that the evidence may not be sufficient where such subsequent relations have all the appearance of the marriage relation, and there is nothing apparently clandestine, and no divided reputation, and the parties acknowledge each other on all occasions and under all circumstances as man and wife to the extent that married persons ordinarily do.

Appeal by John H. White, administrator, from an order of the District Court of Ramsey County, *Chas. D. Kerr*, J., made February 7, 1894, denying his motion for a new trial.

Frederick Terry died intestate February 27, 1892, at St. Paul. Letters of administration of his estate were granted to John W. White. He collected and disposed of the personal property, paid the debts, funeral expenses, and taxes on the real estate, and presented his account and asked for its approval and a final decree of distribution. A day was appointed and notice published. At the final hearing May 29, 1893, Ellen Balderson appeared and claimed to be the wife of the deceased and prayed the court to assign the property to her as his sole heir under Laws 1889, ch. 46, § 64. Her claim to be the widow of deceased was disputed by his next of kin and decided against her by the Probate Court, and the real and personal estate of deceased was on June 6, 1893, adjudged to his two brothers and three sisters in equal shares. From this decree she appealed to the District Court of Ramsey County. There an issue of fact was tried before a jury, who returned a verdict that she was

the wife of Frederick Terry at the time of his death. Findings were made in accordance with this verdict and judgment ordered. The administrator moved the court to set aside the verdict and grant a new trial. Being denied he appeals.

*Briggs & Countryman* and *John W. White*, for appellant.

There is no evidence from which the jury were justified in finding that any agreement of present marriage was ever entered into by Frederick Terry and the respondent. How can a presumption be entertained to establish a marriage which the very party who invokes the presumption has deliberately repudiated and denied? Respondent comes into court saying, "I don't believe I was Terry's wife, but I want the jury to listen to these three or four witnesses who heard him call me his wife, and I invoke the presumption arising therefrom that I was his wife, under a contract which I never knew of or believed in myself." *Cross* v. *Cross*, 55 Mich. 280; *Port* v. *Port*, 70 Ill. 484; *Harbeck* v. *Harbeck*, 102 N. Y. 714.

The law presumes that where the relation between a man and woman was meretricious in its inception, they had no desire to change it, and that it continued to be of the same illicit character to the end. Particularly is this true where there existed no legal impediment to marriage. This presumption must be overcome by strong and satisfactory evidence. *State* v. *Worthingham*, 23 Minn. 528; *Fagan* v. *Fagan*, 57 Hun, 592; *Floyd* v. *Calvert*, 53 Miss. 37; *Cartwright* v. *McGown*, 121 Ill. 388; *Arnold* v. *Cheesebrough*, 46 Fed. Rep. 700, 58 Fed. Rep. 833; *Tholey's Appeal*, 93 Pa. St. 36; *Clark* v. *Cassidy*, 64 Ga. 662.

The presumption that the connection between the parties continued to be illicit holds until that presumption is overcome by distinct proof of marriage. *Barnum* v. *Barnum*, 42 Md. 251; *Hunt's Appeal*, 86 Pa. St. 294; *Breadlabane Case*, L. R. 1 H. L. Sc. 182; *Goldbeck* v. *Goldbeck*, 18 N. J. Eq. 42; *Reading Fire Ins. Co., Appeal of*, 113 Pa. St. 204; *Spencer* v. *Pollock*, 83 Wis. 215; *Williams* v. *Williams*, 46 Wis. 464; *Oddfellows Ben. Assoc.* v. *Carpenter*, 17 R. I. 720.

Again it is well settled by all the authorities that a conflicting, uncertain or divided reputation is not sufficient to warrant the inference that marriage had taken place. The relation must be undis-

puted, at all times and in all places openly admitted by both parties. *Clayton* v. *Wardell*, 4 N. Y. 230; *Brinkley* v. *Brinkley*, 50 N. Y. 184; *Rose* v. *Clark*, 8 Paige, 573; *Bicking's Appeal*, 2 Brewst. 202; *Appeal of Reading Fire Ins. & T. Co.*, 113 Pa. St. 204; *Yardley's Estate*, 75 Pa. St. 207; *Arnold* v. *Chesebrough*, 58 Fed. Rep. 833; *Powers* v. *Charmbury*, 35 La. An. 630; *Hubblethwaite* v. *Hepworth*, 98 Ill. 126.

*Stevens, O'Brien, Cole & Albrecht*, for respondent, after an extended discussion of the evidence, said:

There is absolutely no evidence that anyone who was in the slightest degree familiar with Terry's mode of living regarded the parties as anything else than husband and wife. There is no divided reputation in this case. Everybody who knew that the parties were living together regarded them as husband and wife, not as man and mistress. Everybody, so far as the evidence shows, to whom Terry had occasion to speak of or about respondent, says that he spoke of her as his wife.

Appellant claims that as the relations of the parties were unlawful in their inception there was no evidence of a change in these relations which warranted the jury in finding the parties were married. Respondent was, by 1878 G. S. ch. 73, § 8, estopped to testify whether at or about the time she commenced to live with Terry any agreement existed between Terry and herself as to their occupying the relation of man and wife, so that it was placing the matter before the jury in, to say the least, a most unfavorable light to say that the relations were meretricious in the inception. But even if the origin was unlawful, it rests exclusively with the jury in the exercise of its judgment, under proper instructions from the court, to say whether or not there was such a change in the relations as showed an agreement to be thereafter husband and wife. *State* v. *Worthingham*, 23 Minn. 528.

The verdict is not manifestly and palpably against the weight of the evidence. Nor is there "no evidence reasonably tending to sustain the verdict," and while we believe that the great preponderance of the testimony sustains the verdict, nevertheless we invoke the rule so often stated, that in such a case the verdict will not be disturbed. *Ohlson* v. *Manderfeld*, 28 Minn. 390.

CANTY, J. · Frederick Terry resided in St. Paul many years and until the time of his death, in 1892. He died intestate. Letters of administration were taken out on his estate, and matters proceeded until the time for hearing on the final account and ordering the distribution of the estate, when the respondent appeared, and claimed to be the widow of the deceased, which was denied by the next of kin, and found against her by the Probate Court. Thereupon she appealed to the District Court, and on a trial there before a jury, the jury found that at the time of his death she was the wife of said deceased, and this is an appeal from an order denying a motion for a new trial.

The principal point urged by appellant is that there is not sufficient evidence to sustain the verdict.

It appears by the evidence that the deceased never was married, unless it was to respondent.

In May, 1885, the respondent, then known as Ellen Balderson, lived in some rooms in St. Paul, and worked in a shirt factory. She seems to have been acquainted with the keeper of a restaurant, who sent her word one evening to call at the restaurant, which she did about 7 o'clock in the evening, and was shown up into a private dining room, where she met and was introduced to the deceased, drank wine, and had supper with him there, and went home late to her rooms. Shortly after, illicit intercourse commenced between them, and for six months she continued her work at the shirt factory, and he visited her at her rooms, and contributed somewhat to her support. The deceased owned a house, which was for rent, and one White was his agent to rent it and collect the rents. Terry sent her to White to rent this house of him, and gave her the money to pay the rent. She rented it, ceased to work in the shirt factory, and went there to live. Terry gave her the money to pay the rent. She paid it to White, and he paid it back again to Terry, never knowing that Terry was in this way paying and receiving rent for his own house, or that he was living there himself. White always knew respondent as Ella Balderson, and gave her receipts for the rent every month in that name. Matters ran along this way for two or three years, when White's clerk had an altercation with Miss Balderson on account of her failure to pay the rent promptly, and Terry then informed White that he would collect the rent himself.

Respondent lived in this house about five years, when Terry sold the house, and she moved to another house, which he rented for her, and she lived there until the time of his death.

Respondent testifies that during all of this time since she first moved into Terry's house he lived there with her, and there is no evidence in the case showing that during this time he lived anywhere else. She admits that he went on a visit occasionally to see his relatives; that he never brought any of his friends or acquaintances to the house; that some of his brothers and sisters were frequently in St. Paul and at Ft. Snelling, but that she never saw any of them, and, except as hereinafter stated, he or she never had any callers or visitors at the house, and he never took her out in public. He broke his leg about four years before his death, and she nursed him, and she also nursed him during his last sickness, and he died in the house where she lived. This is proved by the testimony of several witnesses. One witness—a physician who attended both of them at such residence—testified that he did not know her as Mrs. Terry until 1885. Another witness—a dentist—testified that in the fall of 1885 Terry requested him to do some work on his wife's teeth, and the woman who came was respondent. Another witness testified that she lived in the same block, and used to wash and do other work for Terry and respondent at their house, and often heard him refer to her as his wife. Another witness testified that he worked in a saloon where Terry used to resort, and once, three years before Terry died, he gave the witness money to get a ton of coal for his wife, and to have it delivered at the house. That witness nursed Terry at their residence for two weeks before he died, and often heard him refer to respondent as his wife. Another witness testified that Terry came to the back yard, and asked her to come in and see his wife, who was sick, and the witness did accordingly. All of this evidence is uncontroverted. Terry had no business, and lived on a small income. He was about forty-seven or forty-eight years old at the time of his death, and respondent about thirty-eight.

After the death of Terry, White took charge of the body, made arrangements for the funeral, and sent the body to the relatives of Terry in the east. He also, with the assistance of respondent, took charge of clothes, articles of jewelry, books, and other personal effects of deceased, and sent them to such relatives, and she consented

to these acts. She told White that she had been living with Terry ever since she rented his house of White.

Respondent testified that after Terry's death she told White that she and Terry were married, but afterwards she admitted that she told him that Terry had promised to marry her, and that he also promised to remember her in his will, and that she was much disappointed because he had not; that she knew that White was appointed administrator at the request of said eastern relatives. ·

She informed White that she nursed deceased in his last sickness, and he, as administrator, paid her $20 therefor, and without any suggestion as to how she should sign the receipt for it she signed it "Ella Balderson." A short time before this she wrote a postal card to White, which she signed with the initials "E. B.," and she admits that she 'had several talks with White in which he talked about her being paid for having been Terry's housekeeper, and that she never at such conversations told him that she was Terry's wife. She also admits that she first learned that she had a claim to be Terry's wife when, some time afterwards, she went to consult her present lawyers. She had no relatives in the city. These are substantially the facts of the case.

We are of the opinion that there is not sufficient evidence to prove a common-law marriage. It is conceded that the connection was at first illicit, and that there never was any marriage ceremony. "If parties come together intending and choosing illicit commerce, there being no impediment to marriage, it cannot be ·presumed without reasons, whatever the law under which they live, that they have altered their choice. A condition of things once shown to exist is presumed to continue." 1 Bish. Mar. & Div. § 506. See, also, *Williams* v. *Williams*, 46 Wis. 464, (1 N. W. 98;) *Harbeck* v. *Harbeck*, 102 N. Y. 714, (7 N. E. 408;) *Cartwright* v. *McGown*, 121 Ill. 388, (12 N. E. 737.)

"The intercourse was originally meretricious, and there was no reason why Blasius should change it. Marriage was not needed as the price to be paid for the gratification of some passion. The girl had already yielded, apparently without much objection, to his solicitation, and was living with him as his mistress. * * * Until the time when they separated, in 1858, they lived together as husband and wife, to the extent at least of sharing the same rooms, and in-

dicating to hotel keepers, dressmakers, servants, and others, with whom they necessarily had occasion to come in contact, that their relationship was a proper one. Standing alone, such testimony would be very strong evidence in support of an asserted marriage, but it is also the way a man and mistress frequently live, in which it may be said they must live if they frequent respectable hotels; and when it appears that their living together began illicitly, something more than mere continuance, coupled with such declarations as would make that continuance pleasant for them, is needed to support an inference that they were married." *Arnold* v. *Chesebrough*, 46 Fed. 700, affirmed 58 Fed. 833.

We do not wish to be understood as holding that, even where it appears that at the commencement the intercourse is illicit, subsequently continuing to live together as man and wife may not be sufficient evidence of marriage, when their subsequent relations have all the appearances of the marriage relation, and not merely a part of those appearances; where there is no divided reputation, no secrecy, nothing apparently clandestine, but they acknowledge each other on all occasions and under all circumstances as man and wife, to the extent that persons occupying that relation ordinarily would. But it sufficiently appears that respondent did not herself regard the relation between her and Terry as that of marriage. After his death she signed the receipt and postal card by her maiden name, and did not consider herself the widow of Terry until she was informed by her lawyer that she could make that claim. This is not consistent with an agreement or understanding that they were married. "We cannot avoid the conclusion that whatever these parties may have done to keep up appearances, neither of them ever supposed they were married. * * * The real question is how they themselves regarded their relation, and reputation is only important as circumstantial evidence of this." *Cross* v. *Cross*, 55 Mich. 287, (21 N. W. 309.) See, also, *Port* v. *Port*, 70 Ill. 484.

"Habit and repute do not create the marriage relation. But it exists where, on the parties cohabiting as husband and wife, and being accepted in society and reputed as such, they are presumed *prima facie* to be such." 1 Bish. Mar. & Div. § 266. It seems to us that respondent has herself rebutted this presumption.

It is given as a reason for the secret and clandestine manner in

which apparently they lived together that such a marriage might be very distasteful to his relatives if known to them, but the acts and admissions of the respondent after his death were sufficient to show that it was not a secret marriage relation, but an illicit relation, that they were attempting to conceal. 1878 G. S. ch. 73, § 99, does not change this rule, but is simply declaratory of the rule of evidence at common law.

This rule may seem harsh in this case. The question usually has arisen where, after the parties had done as these parties did, they separated, and one or both married some one else. Years afterwards, when one of them died, the other appeared with this kind of proof of a common-law marriage to make bastards of the children, and take the property of the dead one.

The marriage relation is too important a matter, and of too much consequence to others besides the immediate contracting parties, to permit it to be established by vague or shadowy proof.

The order appealed from should be reversed. So ordered.

COLLINS and BUCK, JJ., took no part.

(Opinion published 59 N. W. 1013.)