In the Matter of the Estate of Mrs. John Boyington, commonly known as Electa J. Pond, and Mrs. Emily P. Jones, v. H. L. Williams, Administrator, and John B. Boyington, Appellant.

**Marriage and divorce:** COMMON LAW MARRIAGE. Cohabitation and the reputed relation of husband and wife may be shown as tending to establish the relation of husband and wife and the mutual recognition of the existence of a marriage, the fundamental inquiry being the mutual intent of the parties, which will be established if it appears that they have lived together intending thereby to become husband and wife; but neither the intention nor consent to the status of marriage can be inferred from cohabitation alone, and reputation will only be considered as bearing on the question of intent.

**Same:** EVIDENCE. The evidence in this case is reviewed and held insufficient to establish a common law marriage, although tending to show cohabitation, and that in their business relations the parties acted in some respects as husbands and wives usually act.

**Same.** Where the evidence shows a divided reputation in the community on the question of a common law marriage it is without probative effect.

**Same:** COHABITATION. Where cohabitation in the beginning was illicit, affirmative proof of a present intention to assume legitimate relations as husband and wife is essential to establish a marriage. In the instant case no such intention is shown.

*Appeal from O'Brien District Court.*—Hon. Wm. Hutchinson, Judge.

FRIDAY, OCTOBER 18, 1912.

ON the application of John B. Boyington, who is named in this proceeding as defendant, his codefendant, H. L. Williams, was appointed administrator of the estate of a woman who, during her lifetime, had been generally known as Electa J. Pond, but who, as alleged in the application was in fact his wife. Thereupon Mrs. Emily P. Jones, a sister of the deceased, petitioned the court to set aside the appointment of said administrator, alleging that John B. Boyington was not the husband of the deceased. By agreement of the parties, the court proceeded to determine the issue, which was tried as in equity, whether at the time of the death of the decedent John B. Boyington was her husband. Finding on the evidence that he was not such husband, the court set aside and canceled the appointment of H. L. Williams as administrator, and substituted in his place Emily P. Jones. From this order and decree, John B. Boyington appeals.—*Affirmed.*

*W. D. Boies,* for appellant.

*Herrick & Herrick,* and *O. H. Montzheimer,* for appellee.

McCLAIN, C. J.—Some time prior to the year 1893 Electa J. Pond, an unmarried woman, built a one-room shanty on a quarter section of land in O'Brien county, intending to perfect her title to it under the homestead laws of the United States. About the same time John B. Boyington, with a similar intention, erected a similar shanty on another tract of land not far distant in the same county. Each claim was contested. Boyington, who had occupied his shanty but two or three nights, moved it onto the land claimed by Miss Pond, and annexed it to her shanty in such form that together the two constituted one residence

of two rooms; and Boyington, who was a widower, lived
continuously thereafter on the land claimed by Miss Pond.
Whether she occupied this combined residence continu-
ously with Boyington from that time, or whether she tem-
porarily, after his coming there to live, stayed with her
sister, Emily P. Jones, and her husband, who lived not far
away, is a matter of some controversy, but Miss Pond
claimed to have had a permanent residence on the land
from the time she first built thereon, and it is conceded
that from the fall of 1894, when a new house was erected
on the land, both she and Boyington lived in that house
until her death in 1907. At the time when they thus be-
gan unequivocally to live in the same house, Boyington
was about fifty-nine years of age and Miss Pond about
fifty-five. In 1896 Miss Pond's claim to the land under
the homestead laws was approved by the Secretary of the
Interior on the finding that she, as an unmarried citizen
of the United States, had held possession thereof under her
homestead entry. At the same time the claim of Boying-
ton to the land which he had attempted to pre-empt was
disallowed. In prosecuting these two claims each of the
parties testified to being unmarried. In 1901 a patent was
issued to Electa J. Pond for the land claimed by her, and
duly recorded in the same year. The controversy in this
case is as to the relation of these parties to each other from
the time that Boyington commenced to live on Miss Pond's
land. It is conceded that there was no evidence of any
ceremonial marriage between them, nor of a written con-
tract of marriage; but the claim of Boyington is that he
and Miss Pond during their joint occupancy of the premises
cohabited as husband and wife, were reputed to be living as
husband and wife, and held themselves out as occupying
that relation to each other, and that from these circum-
stances a presumption of present intent to be husband and
wife is established so as to entitle him now to the rights
of surviving husband; while the contention for the other

side is that a common law marriage is not established by the evidence, and that Boyington resided on the land only in pursuance of some arrangement by which he was to carry on the farm in the joint interest of himself and Miss Pond.

There is no substantial controversy between the parties as to the law in this state relating to common law marriages. It is well settled that, while cohabitation and the reputed relation of husband and wife may be shown as tending to give color to the relation of the parties and the recognition each by the other of the existence of a marriage between them, the fundamental question is whether their minds have met in mutual consent to the status of marriage which will be sufficiently established if it appears that they have lived together, intending thereby to be husband and wife. Neither such intention nor consent can be inferred from cohabitation alone, and reputation is of no significance, save as it has a bearing on the question of intent. Supporting this statement of the law as it has been recognized by this court, see *Brisbin v. Huntington,* 128 Iowa, 166; *State v. Rocker,* 130 Iowa, 239; *McFarland v. McFarland,* 51 Iowa, 565; *Pegg v. Pegg,* 138 Iowa, 572. It will be important, therefore, to examine the evidence relied upon for appellant, first, as to cohabitation; second, as to the general conduct of the parties toward each other in their relations with the public bearing upon the question of whether they held themselves out to the world as being husband and wife; and, third, as to the general repute in the community with reference to whether they were living together as husband and wife or in some other relation.

The evidence for the appellant tended to show that these parties cohabitated—that is, that they lived together in a manner which would be unlawful if they were not husband and wife—and, in the view which we take of the case, discussing it solely with

1. MARRIAGE AND DIVORCE: common law marriage.

2. SAME: evidence.

reference to the evidence for the appellant, we may concede
that cohabitation is established. We may concede, also,
that in their business relations with others they acted in
some respects as husbands and wives usually act. No dis-
tinction was systematically maintained as to liability for
debts incurred by either of them. They frequently con-
sulted together in the making of purchases, not only of
machinery and improvements for the farm, but also of
articles of clothing; and apparently all expenses were met
out of some common fund into which all the income from
the farm operations was turned. With the consent of each
merchants credited the produce of the farm when disposed
of to the account of one or the other as they saw fit, and no
objection was made by either to charges entered on his or
her account for purchases intended for the other. Boying-
ton was allowed to make sales of the produce of the. farm
and of the stock kept upon it according to his own judg-
ment, but usually as the result of a consultation with
Miss Pond. Nevertheless Miss Pond continued until the
time of her death to transact business in her maiden name,
and all instruments requiring her signature appear to have
been signed by her in that name, either personally or
by Boyington, purporting to act for her and under her
authority. In 1897 a, tract of land in Dakota was con-
veyed by warranty deed to "E. J. Pond." In 1902, a
deed of the same land was executed by "E. J. Pond" to a
purchaser. On various dates between 1894 and the time of
her death receipts, checks, and notes were signed by "E.
J. Pond," individually or with that name "per John Boy-
ington." Promissory notes payable to "E. J. Pond" were
signed by J. B. Boyington; one of such notes being secured
by chattel mortgage .on certain animals. These instruments
are referred to simply as showing that in this respect, at
least, neither of the parties was announcing to the world
the existence of the relation between them of husband and
wife. So far as we can discover, Electa J. Pond never,

by any written signature or in any business transaction, indicated that she was or claimed to be Mrs. Boyington.

In social matters the apparent relations of these parties remained throughout somewhat ambiguous. Boyington took Miss Pond on a few occasions to places of public resort such as lectures, dances, and church sociables, and, when they were thus seen together, the conduct of Boyington seemed to be such as to indicate a desire on his part to be agreeable to Miss Pond. But they practically never made or received visits, and the only persons who appeared to have ever eaten meals with them were hired helpers and people who came on business errands. To those who came to the house occasionally without knowing anything about the nature of the relations of these parties to each other they seemed to act as husband and wife might, but no one testifies to their addressing each other as husband or wife, or in any way definitely indicating that relation. Boyington called Miss Pond, "Electa," and she called him "John" or "Boyington." On two occasions, explaining to strangers the presence of Miss Pond in the house, he said "this is my woman," and the stranger in each instance, inferring the words to indicate that they were husband and wife, addressed her as Mrs. Boyington without protest on her part. But she was not thus addressed by neighbors and business people who were familiar with the situation. When addressed as Miss Pond, she never made any effort to deny the imputation that she was not married. Not long before her death, Boyington spoke of her to a woman who came to help about the house as "Miss Electa Pond," and that woman raised a question as to their relations without receiving any assurance that they considered themselves to be husband and wife. Another witness testified that as a lawyer he was consulted by the parties jointly, not long before the death of decedent, as to a proposed disposition of their property by which the survivor should have all; but on this occasion Boyington introduced the woman to this

witness as Miss Pond. We find no evidence that he ever introduced her as Mrs. Boyington or as his wife. Witnesses were interrogated as to whether these parties used terms of endearment to each other, or terms indicating relationship such as husband and wife would be likely to use, but no such fact was developed, save in one instance of a neighbor who testified that Boyington came to his house when intoxicated, having lost his way, and, when the witness took him home, Miss Pond met them with the exclamation, "John, you are drunk again," to which Boyington replied, "Now, dear Electa, I will never do it again." This witness testifies that he had been at their house frequently, and neither of them ever in his presence addressed the other as husband or wife, and that, although he himself sometimes addressed her as Mrs. Boyington and sometimes as Miss Pond, Boyington himself never addressed her as Mrs. Boyington. It is also significant that when Boyington's daughter by a former marriage, whom he had abandoned in Illinois twenty years before, when she was but seven years of age, her mother being then deceased, came to visit her father, and found him living with Miss Pond in ambiguous relations, Miss Pond said they were not married, and explained that "on account of the land" they had never been married, though they had been living as man and wife, sharing equally in the profits of the place. Just how far the testimony of this witness on cross-examination as to declarations of Miss Pond was competent we need not determine. We regard it as significant that this witness for appellant, though testifying on direct examination that Miss Pond negatived any marriage, did not speak of any mutual recognition of an existing marital relation.

In the matter of repute there was a divided opinion in the community. It seems to have been generally assumed that there had never been any regular marriage. Some people thought that they were living in illicit relations. It was generally conceded by the

3. SAME.

witnesses that the circumstances under which they were living were suspicious, and were so regarded by all who knew them. As already indicated, reputation is important only as bearing upon the intention of the parties in living together, *Cross v. Cross,* 55 Mich. 280 (21 N. W. 309), and a divided reputation has no probative force. *Eldred v. Eldred,* 97 Va. 607 (34 S. E. 477; *Taylor v. Taylor,* 10 Colo. App. 303 (50 Pac. 1049); *Jackson v. Jackson,* 80 Md. 176 (30 Atl. 752); *Williams v. Herrick,* 21 R. I. 401 (43 Atl. 1036, 79 Am. St. Rep. 809); *McKenna v. McKenna,* 180 Ill. 577 (54 N. E. 641).

It is contended for appellant that the division in general repute as to the relations of these parties was due to a misunderstanding as to what was meant by marriage; those who thought that the parties were not married believing that a ceremonial marriage was necessary. But the record does not adequately sustain this contention. It appears without substantial controversy that there was a well-founded belief in the community that these parties were living together in illicit relations; that is, although cohabiting, they were not husband and wife.

The term "cohabiting as husband and wife" is ambiguous. It may mean cohabitation under the assumption of the relation of husband and wife, or it may as well mean, without regard to any such actual relation, in the manner of cohabitation as between husband and wife. As already indicated, the fact of cohabition alone, no matter how continuous, is not sufficient in itself to give rise to the presumption of marriage. There is an attempt, also, to explain the failure to enter into a formal marriage by reference to the fact that Miss Pond could not, as she was advised, perfect her homestead claim in her own name or otherwise if she became a married woman before obtaining complete title to the land. In other words, it is the contention of the appellant that, while marriage in fact existed between him and Miss Pond while she occupied the

land as a homesteader, she concealed that fact, and falsely
testified in the proceedings before the Land Department
in order to perfect her claim.. This theory would be more
plausible if, after she obtained title to the land, five years
subsequently to the recognition of her right as homesteader
by the Land Department, she had asserted to the whole
world in some unmistakable manner that she was the wife
of Boyington in pursuance of a prior marriage, though
clandestine, or had then entered into a formal marriage
with him.   In view of the doubt which she must have
known to exist in the community with reference to her re-
lations with Boyington, arising, if in no other manner,
from her knowledge of the fact that, though living con-
tinuously with him in the same house, she was using her
maiden name, we think it would have been in accordance
with the promptings of a woman's instinct to either declare
in some public way, by the subsequent use of her married
name in business instruments, if not otherwise, that she
was in fact Boyington's wife, if. that was the fact, or to
make that fact clear by a formal marriage, to which there
was no impediment whatever.   No excuse is suggested for
the failure on the part of these parties to make clear their
marital relations, if any such existed; on the contrary, for
five or six years after every reason for concealment had
ceased, they continued as before their. ambiguous relation-
ship.

The purpose and intention of Boyington in his rela-
tions with Miss Pond were of the greatest importance as
bearing on the fact of a marriage.   No doubt as a witness
he would have been incompetent to testify to any trans-
actions or communications with the deceased amounting
to a mutual agreement to marry, but he was not incom-
petent to testify as to his own purposes and intentions and
the circumstances under which their cohabitation was begun
and continued, yet as a witness he failed to give any ex-
planation whatever of their ambiguous relations.   He tes-

tified as to his going to live on the land in 1893, and to living alone there with Miss Pond in 1894, and continuously thereafter until her death; to his managing the farm and contracting in regard to the improvements thereon; to going with Miss Pond in a single wagon to South Dakota where she owned land; to the absence of any legal impediment to a marriage between them; to the value of his services in such management, and to his personal care of her in the sickness which preceded her death; but he nowhere testifies that he lived on the place with the assumption or in the belief that he was the husband of Miss Pond, or that he held her out publicly as his wife, or that she was generally regarded as his wife by the community, and he nowhere testifies that either at the beginning or during the continuance of his relations with her was there any assumption on his part of marriage. He does testify that with Miss Pond he consulted lawyers as to the effect which marriage would have on the validity of her homestead claim, and that while riding with another witness on the return from South Dakota he and Miss Pond talked about getting married, and in this he is corroborated by such other witness; but he gives no explanation of the failure to carry out this intention. The same witness testifies that on another occasion on a train they spoke of an intention to get married.

But it is well settled that, where cohabitation is in its beginning illicit, affirmative proof of a subsequent present intention to change that relation into the legitimate relations of husband and wife is essential to establish a marriage. *Henry v. Taylor,* 16 S. D. 424 (93 N. W. 641); *Terry v. White,* 58 Minn. 268 (59 N. W. 1013); *Grimm's Appeal,* 131 Pa. 199 (18 Atl. 1061, 6 L. R. A. 717, 17 Am. St. Rep. 796); *Weidenhoft v. Primm,* 16 Wyo. 340 (94 Pac. 453).

4. SAME: cohabitation.

To our minds the evidence introduced in behalf of the appellant, disregarding entirely the evidence offered for

the appellee, falls far short of affording a satisfactory basis from which to infer that there was at any time a present intention on the part of Boyington and Miss Pond to assume toward each other the relations of husband and wife, and we reach the conclusion, therefore, that the finding of the trial court that no such relation existed was correct.

The decree is, therefore,—*Affirmed.*

LADD, J., takes no part.