In the Matter of the Estate of Otto W. Wittick, deceased.

ADOLPH ·J. WITTICK, GUSTAVE A. WITTICK, CARL HERMAN
    WITTICK and WILHELMINE OPFERKUP, Appellants, v.
    EMILIE ENGLE WITTICK, Appellee.

Marriage: CONSANGUINITY: VALIDITY. A marriage between first
    cousins solemnized in violation of a statute prohibiting such mar-
    riages is void; and a common law marriage between cousins unless
    consummated prior to the passage of such a statute is also void.

Same: EVIDENCE: TRANSACTIONS WITH A DECEDENT. In an action to
    establish the rights of claimant in a decedent's estate by virtue
    of an alleged common law marriage, evidence that claimant was
    expecting to marry decedent until she discovered that he was
    addicted to the use of liquor, when she declined unless he should
    reform, but that after some time and an apparent reformation she
    consented, was inadmissible under the statute prohibiting conversa-
    tions with a decedent, except so far as it tended to show claim-
    ant's intent and the circumstances under which their relations
    began.

Same. Evidence of claimant, seeking to establish a right in the estate
    of decedent under a common law marriage, that from the time
    she had agreed to marry decedent she considered herself as his
    wife, and that the formal ceremony should be performed when they
    could go to the proper church, was admissible on the question of
    her intent, and is not prohibited as a communication with de-
    cedent.

Same. Evidence showing the relation of parties after the passage of
    a law prohibiting their marriage because of consanguinity is ad·
    missible, not to show a common law marriage after that date but
    as explaining the relation of the parties prior to the passage of the
    law.

Same: COMMON LAW MARRIAGE: EVIDENCE. A mutual agreement to
    presently become husband and wife, followed by cohabitation as
    such, constitutes a valid common law marriage of parties not
    legally disqualified from marrying; and if the relations prior to
    the passage of a disqualifying statute were such as to constitute

a valid common law marriage, neither the enactment of the statute nor a subsequent invalid marriage ceremony would affect the previous marriage by agreement. In the present case the evidence is held to show a valid common law marriage between first cousins prior to the passage of the statute prohibiting such marriages.

*Appeal from Hancock District Court.*—HON. C. H. KELLY, Judge.

TUESDAY, MARCH 17, 1914.

PROCEEDING to establish rights in an estate under a common-law marriage with decedent. From judgment in favor of the defendant, finding that she is the widow, the plaintiffs appeal.—*Affirmed.*

*Senneff, Bliss & Witwer,* and *Williams & Clark,* for appellants.

*Sol Levisohn,* and *John Hammill,* for appellee.

WITHROW, J.—I. Otto W. Wittick having died intestate in October, 1911, a resident of Hancock county, application for the appointment of an administrator of his estate was made by Emilie Wittick, who claimed to be his widow, and, waiving her right to act, she requested the appointment of another, which was done. Following this, an application to set aside the appointment was made by Adolph J. Wittick, a brother of the decedent, alleging that Emilie Wittick was not the widow of Otto W. Wittick, that she was his first cousin, that a pretended marriage ceremony between the parties was performed in Illinois, but that under the laws of that state, which prohibited the marriage of first cousins, the marriage was void; and that at the time of such ceremony the laws of Iowa made a like prohibition. Based upon these averments, he asked to be appointed administrator of the estate of his brother. Emilie Wittick, as we shall hereafter speak of her

in this opinion, appeared in resistance to the motion, averring that she and Otto W. Wittick lived together as husband and wife, commencing the latter part of March, 1909; that such was generally known; that the decedent from that time and up to his death held out to the world that they were husband and wife; and that she became the common-law wife of Otto W. Wittick in March, 1909. Following this resistance, she made application for one year's support from the estate, as widow, to which objection was made by the brothers and sister of the decedent upon the grounds presented in their motion to set aside the appointment of administrator. Trial was had upon the issues thus raised, and judgment was entered finding Emilie Wittick to be the widow of Otto W. Wittick, deceased, and granting to her an allowance from the estate for her support. From such finding and judgment this appeal is brought by the brothers and sister of decedent.

II. Before going to the facts, we give attention to the law as determining the right upon which the claim of the appellee must rest. The fact that the parties were first cousins is not disputed. Upon the trial it was conceded that the statute of Illinois, at the time the marriage ceremony was performed in that state, which was in September, 1909, prohibited the marriage of first cousins and declared marriages entered into in violation of such provision to be void. In Iowa a like statute went into effect on July 4, 1909, but prior to that date marriages in this state within that degree of relationship had not been prohibited. It therefore must be held that no rights were acquired by the appellee under the Illinois ceremony, and also that no rights could arise under a common-law marriage in Iowa, between cousins, unless such was entered into prior to July 4, 1909, and supported by facts as to such relation prior to that time as are necessary to meet the degree of proof required to establish such a status. *Drummond v. Irish*, 52 Iowa, 41. The single question which is left for consideration is whether, as claimed by the appellee, a common-

1. MARRIAGE: consanguinity: validity.

law marriage contract was entered into in Iowa between herself and Otto W. Wittick in 1909, prior to the time that the marriage of first cousins was prohibited by the law of this state.

III. Emilie Engle Wittick, the appellee, was at the time of the trial about thirty-one years of age. She came to the United States when she was eighteen years of age, and about four years later was married to her first husband, Charles Engle, in New York City. Four years later he died, and she returned to her old home in Germany for a visit. Later, on her return to this country, upon the suggestion of her brothers, a correspondence was opened between herself and Otto W. Wittick. He was at the time a resident of Waterloo, in this state, and unmarried, having been divorced from a former wife, and it is satisfactorily shown by the competent evidence that she came to Waterloo at the request of Wittick, and with the expectation upon the part of both that they would be married. After her arrival in Waterloo with her little son by the former marriage, she became the housekeeper for Otto W. Wittick, this being in October, 1908, and continued in that relation until the spring of 1909, when they removed to Steamboat Rock, Iowa, where he purchased a butcher shop, and entered upon that business, and their residence at that place was continued until late September of that year, when the business was sold by him. At the time the appellee came from New York at the request of Wittick, he was addicted to the use of intoxicating liquor, and while they resided in Waterloo he went away to take the cure at some institute, and returned about March 1, 1909.

2. SAME: evidence: transactions with a decedent.

Evidence was offered and introduced over the objections of the appellant as to conversations had between the parties both before leaving and after his return to Waterloo from his treatment, the effect of which was to show that while she came west expecting to marry him, upon discovering his habits she declined to do so unless he showed reformation; and that

upon his return, with the renewed request to enter upon the marriage relation, she still declined, until after about three weeks had passed and he seemed to have conquered his habit, when she consented to so do. This evidence, and much of like purport, being of conversations between herself and Wittick, at the time of the trial deceased, was objected to as being incompetent under section 4604 of the Code. As a reason for receiving it counsel for appellee urges that the testimony comes within the exception of the statute which provides that the prohibition shall not extend to any transaction or communication as to which the opposite party shall be examined in his own behalf. That exception but opens the way for proving an entire conversation or transaction when a part of it has been proven by the opposite party, or when the proof of such party as to the particular conversation or transaction is such in effect as to disclose the transaction in whole or in part, and subject it in its entirety to investigation and proof. Much of the testimony objected to in this case was of conversations between the appellee and Wittick, as to which no other witness had testified, and we think it comes clearly within the rule of the statute, and is incompetent as proving an agreement, but is in part admissible as proof of her intent and the circumstances under which their relations commenced. This question had consideration *In re Boyington's Estate,* 157 Iowa, 467, decided by this court, where the question of a common-law marriage was being considered, and in which the following language was used: "No doubt as a witness he (the appellant) would have been incompetent to testify to any transactions or communications with the deceased amounting to a mutual agreement to marry, but he was not incompetent to testify as to his own purposes and intentions and the circumstances under which their cohabitation was begun and continued." During the residence of the parties at Waterloo there is shown by the record no public declaration by either of them that they were married, although they occupied the same room, and as to each other maintained that relation.

It was while residing there that the appellant claims the agreement was made between them that from that time on they should be as married, and that when they were able. to go to the church of her choice, the German Apostolic, there being none at Waterloo or at Steamboat Rock, where they afterwards went to reside, the formal ceremony should be performed.

She also testified, and this we think was competent as bearing upon her intent, that from that time on she considered herself to be his wife, and that the formal ceremony should be performed when they could go to the proper church. While much of this testimony is incompetent as being of conversations with the deceased, that to which we have just referred, with other evidence, sheds light upon the intent with which she entered upon and sustained the relations with Wittick which are shown by the evidence.

3. SAME.

The parties left Waterloo about April 20, 1909, going first to Des Moines, where they stopped at a hotel, where she was introduced by him to the proprietor as his wife, and they were so registered. Her little son was with them, and they occupied one room, the boy sleeping on a cot. After remaining in Des Moines four or five days, they went to Steamboat Rock, staying for two nights at the home of Chas. Hess, to whom the decedent introduced the appellee as his wife. They soon procured a house, and established a home. From and after the time they removed to Steamboat Rock, the evidence shows that he often introduced her to others as his wife, that the little boy called Wittick papa, that at the meat market she met the customers to whom she was introduced as his wife, and no evidence as to their life in that place tends to show any other relation or purpose, or any knowledge, understanding, or belief of others casting doubt upon the legitimacy of their relations. As tending to show a holding out to the public of their relations as man and wife after their arrival at Steamboat Rock, a witness, Ole Matheson, testified that he worked in the butcher shop which was sold to Wittick, in

April, 1909, by Chas. Hess, and continued to so work after the change in ownership; that he met Mrs. Wittick in the shop and was introduced to her by Wittick as his wife; and that he at different times heard him so introduce her to others. He testified that they were keeping house there, and that it was generally understood that they were husband and wife. The witness testified that he later purchased the business, and that Mr. and Mrs. Wittick both signed the papers which were evidence of the sale. His purchase of the shop was in September, 1909, and before the Illinois ceremony was performed. He also testified that the little boy called Wittick his papa.

Chas. Hess, by whom the butcher business at Steamboat Rock was sold to Wittick, testified that in April, 1909, after the purchase, Wittick informed him of his desire to rent a house, stating that he had a wife and one boy; that they soon after moved there, and he was introduced by Wittick to Mrs. Wittick, as his wife; and that she also was so introduced by Wittick to Mrs. Hess; that they occupied one room in his house, until their household goods arrived. He testified that he saw Wittick introduce her to a number of persons as his wife; that he supposed they were husband and wife; that "he brought her there as his wife, introduced her, lived with her, and we all thought she was his wife."

One Turner was cashier of the bank at Steamboat Rock at the time the Witticks resided there. He testified that he thinks he was introduced to her by Wittick as his wife, but was not certain, but he did hear him so introduce her to others; that she assisted him in the shop, spoke to him as her husband; and it was generally understood that she was his wife. This witness testified that he drew the instrument conveying the meat market, including certain real estate, a certified copy of which was introduced in evidence, and that it was signed by O. W. Wittick and Emilie Wittick. This instrument was signed and acknowledged September 4, 1909, and recited that they were husband and wife. While at Steamboat Rock Mrs. Wittick received mail addressed to her as Mrs. E. Wittick,

one card of date September 4, 1909, written from Parkersburg, Iowa, signed, "Your husband, O. Wittick," and others from friends or relatives in the East, all of which were prior to the Illinois ceremony, and after July 4, 1909.

As to all of the evidence relating to transactions after July 4th, objection was made on the ground that it was incompetent to prove a common-law marriage, as at such time under the law of this state such could not be contracted between the parties because of their blood relationship. We think the evidence was competent, not as tending to show a relationship entered into between the parties after that date, but as bearing upon and explanatory of what had preceded that time.

4. SAME.

Excluding that part of the testimony of Mrs. Wittick which was of personal transactions and communications, the foregoing is, in substance, that upon which the case of the appellee must rest.

The evidence on the part of the appellants was to the effect that at Waterloo the appellee was known as Emilie Engle, that she was so known by the brothers and relatives of the deceased, and that while residing there there was no claim that she was his wife; and a brother whom they visited when passing through Des Moines, on their way to Steamboat Rock, knew her only as his cousin, although he knew they were staying at the hotel.

Adolph J. Wittick, a brother, testified to a conversation with Mrs. Engle in Waterloo shortly after she came out from New York, in regard to her marrying Otto. She said that he had written her to come, and that Otto promised to be a sober man, and he would marry her some time later; and that she was dissatisfied when she saw how heavily he was drinking, and that he (Adolph) urged her to stay and keep house for Otto. That marriage between the parties was contemplated clearly appears from his testimony, although he says he never advised it. He also testifies that shortly before they removed to Steamboat Rock, after Otto had been drinking again, that

he (Adolph) advised the purchase of a meat market in a small town, and that he requested the appellee to go with him, to give Otto a trial, to which she finally consented, and that if he did keep sober for a year she would marry him. On cross-examination he said that he had thought it would be a good thing for him to marry her if he would straighten up. She said she never would marry him unless he became a man. Other witnesses on the part of the appellant testified as to facts bearing upon the relations of the parties while at Waterloo, but presented nothing in contradiction of the proof as to their relations while at Steamboat Rock. The foregoing is a fair summary of the testimony.

IV.   As to what constitutes a "common-law marriage," and what evidence is competent to establish such a relation, is a subject upon which the authorities are in harmony, the difficulties presented in such cases arising under the facts. *In re Boyington's Estate, supra,* states the rule that: "While cohabitation and the reputed relation of husband and wife may be shown as tending to give color to the relation of the parties and the recognition each by the other of the existence of a marriage between them, the fundamental question is whether their minds have met in mutual consent to the status of marriage which will be sufficiently established if it appears that they have lived together, intending thereby to be husband and wife." And in determining the question public conduct of the parties, and public repute, if uniform, is entitled to weight. *Pegg v. Pegg,* 138 Iowa, 576. In the case of *McFarland v. McFarland,* 51 Iowa, 570, this court held that, while cohabitation does not of itself constitute marriage, yet it is sufficient if the parties so cohabiting intend present marriage; and in the earlier case of *Blanchard v. Lambert,* 43 Iowa, 228, was quoted and adopted the settled rule of the common law that "any mutual agreement between the . . . husband and wife *in præsenti,* followed by cohabitation, constitutes a valid and binding marriage, if there is no legal disability on the part of

5. SAME: common law marriage: evidence.

either to contract matrimony.'' The rule is also recognized in *Leach v. Hall,* 95 Iowa, 611, and *State v. Rocker,* 130 Iowa, 239; 26 Cyc. 872.

The relation between the parties from the time of taking up their residence at Steamboat Rock in April, 1909, up to the time of the ceremony in Chicago, in September of the same year, was, so far as appears from the testimony, in all respects as of husband and wife. That it had been their intention or expectation to marry when she came out from New York is clear, and that marriage was postponed because of his habits is satisfactorily shown by competent evidence. We think it also is quite within the proof that from the time of their going to Steamboat Rock there was on the part of both a present intent to maintain towards each other and to the world the status of husband and wife; and he so held her out to the public, she so recognized him, her little son, so far as he could give like recognition, and this was presumably with the consent of both, as they knew of it. She entered into his business transactions with him, and when necessary joined as his wife in the conveyance of real property; there was public recognition of them in their presumed married state; and at no time was there any question raised as to it. This relation began at a time when the marriage of first cousins was not prohibited in this state, continuing without interruption up to the time of the Illinois ceremony, and was maintained until his death, which was shortly after.

If the relation between the parties prior to July 4, 1909, had been of such nature as to establish the common-law marriage, the subsequent law could not affect it; nor could the ceremonial marriage later performed add to or diminish the legal strength of their relationship. As to this latter, it is urged that the relations of the parties were up to that time incestuous, existing only in contemplation of the future marriage, and that the fact that the ceremony was had is strong evidence that they had not previously been to each other and to the public as husband and wife.

But we think a fair reading of the record in the case leaves no reasonable doubt, indeed it affirmatively shows, that the relation was actually entered into in April or prior to that in 1909, with the intent to be husband and wife, followed by that public recognition which met the requirements of the law, and that the subsequent ceremony, invalid though it was, but not shown to have been so known to the parties, was but the formal and ceremonial recognition of that which had been assumed by them under an agreement and with their present intent that from such time forward they were husband and wife.

The conclusion of the trial court was right, and it is—
*Affirmed.*

LADD, C. J., and DEEMER and GAYNOR, JJ., concur.