**IN THE COURT OF APPEALS OF IOWA**

No. 23-1501
Filed August 6, 2025

IN RE THE MARRIAGE OF JEREMY JOHN MUSSO
AND CRYSTAL L. RANDOLPH

Upon the Petition of
**CRYSTAL L. RANDOLPH,**
        Petitioner-Appellant,

**And Concerning**
**JEREMY JOHN MUSSO,**
        Respondent-Appellee.
_____

**JEREMY JOHN MUSSO,**
        Petitioner-Appellee,

**vs.**

**CRYSTAL LYNN RANDOLPH,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Joseph Seidlin, Judge.


        A petitioner appeals the district court's dismissal of her dissolution petition and its entry of a child-custody order under Iowa Code chapter 600B (2020). **AFFIRMED.**


        Karmen R. Anderson of Anderson & Taylor, PLLC, Des Moines, for appellant.

        Matthew G. Sease of Sease & Wadding, Des Moines, and Carmen Eichmann of Eichmann Law Firm, West Des Moines, for appellee.

Considered without oral argument by Schumacher, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

Crystal Randolph appeals the district court's dismissal of her dissolution petition and its entry of a child-custody order under Iowa Code chapter 600B (2020) after finding that she failed to prove a common-law marriage with Jeremy Musso. She argues that on our de novo review, we should find that she met her burden of proof. But giving appropriate deference to the district court's factual findings and its well-supported determination that neither party is credible, we agree that Randolph failed to prove a common-law marriage. The parties' many shifting assertions of married and single status in different contexts reflect an intent to serve their personal convenience or financial benefit—not a present intent and agreement to be married. We thus affirm the district court's order.

I.

Randolph and Musso met for the first time in February 2003. They were both in their twenties and soon began dating. By Labor Day weekend, they were living together in a Des Moines home recently bought by Musso. And the next year, the couple welcomed their first son. A second son was born four years later. And the family lived together until early 2015, when Randolph moved to her own home in Altoona. The relationship continued for another two years—with the parties living separately or Musso living at Randolph's home. But in mid-2017, their relationship ended for good. And they eventually began seeing other people. Randolph and Musso never formally married. *See* Iowa Code ch. 595.

In November 2020, Musso petitioned under Iowa Code chapter 600B seeking joint legal custody and joint physical care of the children and an order establishing the parties' child-support obligations. Randolph responded by arguing

the 600B case should be dismissed because the parties were common-law married and separately petitioning to dissolve their marriage. In both cases, she argued that the children should be placed in her physical care rather than joint physical care. And in the dissolution case, she sought spousal support and an equitable property division—relief not available for unmarried parents in chapter 600B proceedings. *Contrast* Iowa Code ch. 600B, *with id.* §§ 598.21, 598.21A.

After a bench trial on both cases over four days in February and March 2023, the district court found that Randolph failed to prove that she and Musso were common-law married. The court first found that "neither party is credible, and both parties have shown themselves to be designing when seeking what they want." The court supported these credibility findings with detailed reasoning. For Musso, it pointed to his testimony that he had lied under oath in a deposition about his marital status and other "cunning means" he used to obtain and present evidence. As for Randolph, it highlighted her dodgy testimony "showing a remarkable lack of candor," her concealment of information to get government benefits, and her laundering of a personal-injury settlement through their joint bank account and then "into $5,000 bundles of cash which she stored in a safety deposit box." And so, the court found "each's self-serving testimony regarding the existence of a common-law marriage to be untrustworthy."

The court instead focused on documentary evidence and the testimony of other witnesses. It helpfully itemized many exhibits and witnesses that could support a finding that the parties intended to be and held themselves out as

married—and many other exhibits and witnesses supporting the opposite finding.[1] The court summed up the evidence as showing "that there were occasions that [the parties] held themselves out as married, usually when it was convenient to do so, or when either or both perceived it to be to their advantage" and "that during the same time period, the parties held themselves out as single for the same reasons." The court also gave particular weight to "a heart-felt letter" from Randolph to Musso that the court found was likely written in 2017 or 2018 and that showed that Randolph knew they "weren't really married."

Given all this, the court reasoned that the parties' "marital status was not consistent, and fluctuated largely based on personal convenience or benefit" and thus was "inconsistent with the concept of marriage." So the court dismissed Randolph's dissolution petition. And in the chapter 600B proceeding, the court agreed with Musso—placing the parties' minor son in their joint physical care and ordered that neither party owed child support to the other.[2]

Randolph now appeals the dismissal of her dissolution petition and the entry of the chapter 600B order, challenging only the court's decision that the parties were not common-law married. She seeks the opportunity to have a dissolution

---

[1] In this itemization, the district court included five proposed exhibits that were never admitted during the trial—three supporting common-law marriage and two undermining it. The proposed but unadmitted exhibits are outside the record, and we do not consider them. *See* Iowa R. App. P. 6.801(a). As Randolph does not argue for reversal on this basis, and we do not believe any reliance on the exhibits significantly affected the district court's other findings, we conduct our de novo review without reference to these exhibits. *Cf. Voves v. Hansen*, No. 22-1651, 2023 WL 7391716, at *2 (Iowa Ct. App. Nov. 8, 2023) (reversing when we could not find reliance on unadmitted exhibits was nonprejudicial).

[2] By the time of trial, the parties' older son had turned eighteen.

decree that includes an equitable division of the parties' property in addition to the unchallenged child-custody matters already decided.

II.

We review the district court's dismissal of a dissolution petition for failing to prove a common-law marriage de novo. *In re Marriage of Martin*, 681 N.W.2d 612, 616 (Iowa 2004). Still, we give the district court's fact findings "weight and defer especially where the credibility of witnesses is a factor in the outcome." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). We do so "because the district court has a front-row seat to the live testimony, viewing the demeanor of both the witness as she testifies and the parties while they listen, whereas our review is limited to reading black words on a white page of a sterile transcript." *Id.* And we recognize that this "greatly help[s]" the district court "in making a wise decision." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (cleaned up).

A party seeking to establish a common-law marriage has the burden to prove three elements: "(1) present intent and agreement to be married by both parties; (2) continuous cohabitation; and (3) public declaration that the parties are husband and wife." *Martin*, 681 N.W.2d at 617 (cleaned up). If established, "a common law marriage is as valid as a ceremonial marriage." *Id.* But it is not favored by any public policy. *Id.* And so, "such a claim of marriage will be regarded with suspicion," *In re Marriage of Winegard*, 278 N.W.2d 505, 510 (Iowa 1979), and "carefully scrutinized," *Martin*, 681 N.W.2d at 617.

Because failing to prove any one of the elements is fatal to a claim of common-law marriage, we focus on whether Randolph proved that both parties had the "present intent and agreement to be married." *Id.* at 617 (cleaned up).

This element "reflects the contractual nature of marriage," which, like any contract, "requires the consent of the parties." *Id.* An agreement can be implied "where one party intends present marriage and the conduct of the other party reflects the same intent." *Id.* And we often look to evidence of "[t]he conduct of the parties and their general community reputation" to prove intent. *Id.* But "fluctuating" conduct and declarations about the relationship status "largely based on personal convenience or benefit . . . undermines support for a present intent and agreement to be married" because it "is inconsistent with the concept of marriage." *Id.* at 618; *see also Laws v. Griep*, 332 N.W.2d 339, 340–41 (Iowa 1983) (reasoning that marriage is more than just a "stable and significant relationship," but rather an institution "defining the fundamental relational rights and responsibilities of persons in organized society" and requiring a commitment to "accept the legal responsibilities of marriage" in return for "marital legal rights"). So too do expressions of "an intent to be married at some future time" undermine support for a *present* intent to be married. *See Martin*, 681 N.W.2d at 617.

On our de novo review of the evidence, we agree with the district court that the parties' fluctuating assertions of marital status reflect their desires to serve their financial or other interests rather than a present intent to be married and all the rights and responsibilities that come with that institution. For example, the parties filed their tax returns as "married filed jointly" for two years of their relationship—tax years 2011 and 2012—but as "single" for any other years they filed taxes both before and after. And in the two years they filed jointly, they reported no income for Musso and thus received significant refunds of about $9000 each year. Musso and Randolph also both signed a notarized "Affidavit of Common Law Marriage"

provided by one of Randolph's employers in 2013. But it was again for a financial benefit—so that he could be included on her employer-provided insurance.

Perhaps most "vexing," as the district court aptly described it, is Musso's prior deposition testimony agreeing that he was common-law married to Randolph. Musso was deposed in July 2016 for a personal-injury suit brought by Randolph for which she eventually received a substantial settlement payment. But even here, Musso claimed that he thought he had to say they were married to help the lawsuit. And we agree with the district court's assessment that while it is not credible that Randolph's attorney would have advised Musso he needed to testify in this way, "it is hard to discount the possibility that [Randolph] and/or [Musso] perceived such testimony to be advantageous to [Randolph's] case."

True, the parties also presented evidence of their communication with each other bearing on their marital status. In one brief text exchange from August 2018—well after their relationship ended—Randolph told Musso she "found a lawyer that will do the divorce for $500 if we don't argue over anything" and he responded not by questioning why they would need a divorce but rather by saying "I have more problems to worry about then getting divorced." But given the timing and limited extent of this exchange, we find this does not move the needle far for Randolph's case.

On the other hand, Randolph sent Musso a three-page handwritten "heart-felt letter," as the district court described it, that sheds much light on her intentions and views of their marital status. Although undated, the district court found—inferring from various timing references in its text with which we agree—that it was written in 2017 or 2018. And given its content, it seems most likely that it was

written before the parties' relationship ended in summer 2017. There, Randolph expressed her feelings of being "in limbo" and frustration at Musso's refusal to talk more about getting married, combining their finances, and buying a new house. She wrote that she "thought we had agreed to get married traditionally" and expressed: "I want to have your last name and feel like I'm yours forever and not just your girlfriend. I want to show our boys that getting someone pregnant and playing house with no commitments is not ok." These statements—for which we see no potential ulterior motive—do not support a finding that the parties were already married. After all, the intent to be married in the future destroys a claim of present intent to be common-law married. *See Martin*, 681 N.W.2d at 617; *see also State v. Grimes*, 247 N.W. 664, 665 (Iowa 1933).

We need not recount all the other conflicting documentary and testimonial evidence of the parties' inconsistent assertions of married or single status in different contexts. The bottom line remains the same—Randolph has failed to meet her burden to prove by a preponderance of the evidence that she and Musso ever had a present intent and agreement to be married. *See Martin*, 681 N.W.2d at 617–18. We thus affirm the district court's dismissal of her dissolution petition and its entry of a custody order under chapter 600B.

**AFFIRMED.**